907 A.2d 477

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Ramon SANCHEZ, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 6, 2005.

Decided Sept. 27, 2006.

Reargument Denied Nov. 21, 2006.

44

Matthew D. Weintraub, Esq., James Bernard Martin, Esq., Amy Zapp, Esq., for Commonwealth of Pennsylvania.

Charles A. Banta, Esq., Allentown, for Ramon Sanchez.

BEFORE: CAPPY, C.J., and CASTILLE, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice SAYLOR.

This is a capital direct appeal, arising out of a robbery-homicide. The background is as follows.

Appellant and Sashana Young, a juvenile with whom he was intimate, moved from New York City to Allentown, Pennsylvania, between one and two weeks prior to the killing on July 18, 2001. Appellant's half-sister, AnnJulie Torrez, lived in the area sometimes staying with relatives, but apparently Appellant was not permitted to stay with those relatives. On the night before the murder, the victim, Lloyd Gehret, gave the trio money for food and permitted them to sleep in an apartment that he owned and was renovating. There was evidence that the victim was attracted to Young and Torrez, and that Appellant was told of advances that the victim had made toward them.

The next morning, when Mr. Gehret arrived at the apartment, Appellant sliced his neck with a utility knife and killed him by bludgeoning him with a hammer. Young and Torres were present in the apartment at various points during the ten or fifteen minutes throughout which Appellant perpetrated the killing, with Young handing Appellant the hammer and stabbing at the victim with a screwdriver at Appellant's direction. As Mr. Gehret lay dying, Appellant took his wallet and keys. Upon leaving the scene, Appellant said: "This is my 17th body, I'll never get caught." He discarded his bloody sweater and sweatpants in a garbage can on a nearby street.

The next day, Torrez voluntarily approached police and provided a statement implicating Appellant and Young in the killing. She disclosed the location of the bloody clothing that Appellant had discarded, which the police retrieved. Further, she indicated that Appellant and Young were staying in a specific room at a boarding house on North Front Street in Allentown, and that Appellant remained in possession of the victim's wallet, which was located there as well. Based on this information, a detective applied for a search warrant, which was issued by a district justice.

A police emergency response team executed the warrant, with two non-uniformed officers entering the building first. Appellant and Young were found in the designated room, along with the victim's wallet and other incriminating evidence.

Upon Appellant's arrest, he unsuccessfully pursued several pre-trial motions, including an attempt to obtain an order suppressing all evidence deriving from police entry into the room in which he was arrested, based on alleged deficiencies in the supporting affidavit of probable cause submitted by an investigating officer. Further, Appellant asserted that the police failed to knock and announce their presence prior to entering to execute the warrant, in violation of applicable procedural and constitutional requirements. Appellant also sought to avoid trial based on a claimed lack of competency. Initially, a court-appointed mental-health professional diagnosed Appellant as suffering from, among other disorders,

paranoid schizophrenia, and he reported that Appellant was incompetent to stand trial. *See* N.T., February 19, 2003, at 212–13. Appellant was thereafter involuntarily committed for further assessment and any necessary treatment. Upon his discharge, the Commonwealth produced testimony at a pre-trial competency hearing that Appellant, while perhaps suffering from some mental disorders, was nevertheless competent and was malingering, and the trial court credited this evidence.

At trial, Young and Torrez testified as Commonwealth witnesses, and Appellant's counsel objected and moved for a mistrial when the Commonwealth adduced testimony from them concerning Appellant's indication that the victim's was his "seventeenth body." Appellant's counsel asserted a general objection and, at sidebar, explained that the statement was "a bombshell" that was "totally unanticipated" by counsel. N.T., March 6, 2003, at 184–85. The district attorney responded that he was certain that he had disclosed the statement prior to trial. The trial court ruled that the testimony was relevant and admissible, but only to demonstrate that Appellant's state of mind reflected a specific intent to kill, and to show that the witnesses had reason to fear Appellant, which aided in explaining their delay in reporting the crimes. The court also gave cautionary instructions concerning the limited purposes for which the evidence could be considered.

Appellant was convicted, *inter alia*, of first-degree murder and robbery. At the penalty phase of trial, the Commonwealth proceeded on the basis of the aggravating circumstance pertaining to commission of a killing while in the perpetration of a felony, *see* 42 Pa.C.S. § 9711(d)(6), here, robbery. The defense presented evidence in mitigation that Appellant was under the influence of extreme mental or emotional disturbance, *see* 42 Pa.C.S. § 9711(e)(2); suffered from an impaired capacity to appreciate the criminality of his conduct or to conform it to the requirements of the law, *see* 42 Pa.C.S. § 9711(e)(3); was of a relatively young age at the time of his crimes, *see* 42 Pa.C.S. § 9711(e)(4); and was subject to life circumstances such as poverty, abuse, and homelessness dur-

ing his childhood that might serve as mitigating factors under the catch-all mitigator, 42 Pa.C.S. § 9711(e)(8). The jury ultimately returned a death verdict following extended jury deliberations, which were interrupted by several reports of impasses. The jurors unanimously found the in-perpetration-of-a-felony aggravator, and one or more jurors credited three of the mitigating circumstances that Appellant had pursued.[1]

In post-sentence motions, Appellant contended, *inter alia*, that the death penalty is unconstitutional as applied in Lehigh County, because prosecutorial discretion is exercised in an arbitrary and/or racially biased fashion in the selection of cases in which the death penalty will be pursued; the juror selection process in Lehigh County systematically excludes members of the Hispanic population, and therefore, violated Appellant's constitutional right to be tried by an impartial jury of his peers; the trial court erred in denying suppression of evidence deriving from police entry into the room where Appellant and Young were arrested, because the search warrant was constitutionally flawed and police failed to knock and announce their presence prior to entry; the trial court erred in finding Appellant competent to stand trial; and the court erred in refusing to grant a mistrial following the introduction of Appellant's statement that "[t]his is my 17th body." The trial court denied post-sentence relief on all claims.

Concerning the allegation of an arbitrary exercise of prosecutorial discretion, the trial court observed that the burden of proof rested with the defense, *see Commonwealth v. Hardcastle*, 519 Pa. 236, 258, 546 A.2d 1101, 1111 (1988), but that Appellant had produced no evidence concerning this claim at a pre-trial hearing that was afforded for that purpose, *see* N.T., January 31, 2002, at 25–26. *See Commonwealth v. Sanchez*, No. 3652 of 2001, *slip op.* at 24–25 (C.P. Lehigh Nov. 5, 2004).[2]

1. Apparently, none of the jurors accepted the age factor as a mitigating circumstance.

2. The court did recognize that Appellant had attached to a pre-trial memorandum several county court opinions reflecting the district attorney's decision not to seek the death penalty in five cases involving Caucasian defendants from 1995 through 1999, in which at least one

Further, the court found that the district attorney had no obligation to produce historical information to the defense upon request, because there was no showing that such information was not equally available to Appellant, either via the office of the Clerk of Courts or through routine investigative work. *See id.* at 19–24. In response to a defense contention that the Commonwealth had agreed to supply the relevant information, the trial court found as a fact that there was no such agreement. *See id.* at 20–21.

The court found a similar failure of proof with respect to the claim that the array of potential jurors for Appellant's trial did not represent a fair cross-section of the community, in that it unreasonably excluded persons of Hispanic origin. Initially, the court noted that Lehigh County's system of utilizing an annual master list of licensed drivers in the county who are eighteen years or older was deemed by this Court to be consistent with constitutional requirements in *Commonwealth v. Lopez,* 559 Pa. 131, 149–50, 739 A.2d 485, 494–95 (1999). The trial court then considered the specific requirements that a challenger demonstrate that an identifiable group is not fairly and reasonably represented in the jury pool, and that this is the result of systematic exclusion of the group from the selection process. *See id.* (citing *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979)). Referencing Appellant's evidence consisting of census data suggesting that the Hispanic population in Lehigh County in the year 2000 represented approximately ten percent of the general county population, the trial court determined that Appellant had established neither element. In this regard, it noted that the census information was not current; there was nothing in the data particularizing the criteria used to identify members of the Hispanic population; nothing was offered to align the ten percent figure with the eligibility criteria for jury service; no evidence was adduced concerning the extent to which Hispanics were actually represented in the jury pool pertaining to Appellant's case; and the only testimonial evidence on

aggravator appeared to be present. The court, however, did not consider these attachments to be evidence.

the subject reflected an entirely race-neutral system of jury selection. *See Sanchez,* No. 3652 of 2001, *slip op.* at 28–29 ("There was not a scintilla of evidence that there was willful or even innocent exclusion of Hispanics from the jury pools in Lehigh County."). The court also indicated that it had appropriately refused to comply with a defense request for it to direct the compilation of information concerning racial composition of jury pools, since such request was never properly made to the court. *See id.* at 30–31.[3] Further, given the evidence that the jury selection process in Lehigh County was appropriate and race neutral, the court saw no basis that would support granting the request in any event. *See id.* at 31.

Next, the trial court addressed Appellant's suppression claims, first focusing on his assertion that the search warrant executed at the room where Appellant and Young were arrested was constitutionally deficient, in that the affidavit of probable cause on which it was based lacked sufficient reliability and/or corroboration. Appellant acknowledged that the affidavit was grounded on Torrez's eyewitness account, but contended that, because Torrez was not referred to by name in the affidavit, but rather, was designated only as "the witness," the affidavit lacked any indication that she had actual knowledge of the facts set forth there. Appellant also recognized that the affidavit disclosed the actual corroboration by police of various information that was supplied by Torrez, but maintained that some corroboration of Torrez's identification of the address at which he and Young were located was necessary before a warrant could reasonably issue.

The trial court applied the totality of the circumstances test for probable cause as established in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and adopted in this Court in *Commonwealth v. Gray,* 509 Pa. 476, 481–88, 503 A.2d 921, 924–27 (1985). *See generally id.* at 484, 503 A.2d at 925 (explaining that the task of an issuing authority for a warrant is "simply to make a practical, common-sense decision

---

3. According to the court, the request appeared only in a footnote in an unfiled pre-trial memorandum submitted by the defense.

whether, given all of the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place" (quoting *Gates,* 462 U.S. at 238–39, 103 S.Ct. at 2332)). The trial court then developed the details of the corroboration of various information supplied by Torrez as disclosed within the four corners of the affidavit of probable cause, including the consistency of her account with the victim's injuries and the retrieval of Appellant's bloody clothing based on Torrez's description of its location.[4] It then analogized the circumstances to *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), involving a search warrant issued upon the content of an anonymous tip, as partially corroborated by subsequent police investigative efforts. Further, the court emphasized the practical nature of the totality-of-the-circumstances test for probable cause established by the United States Supreme Court in *Gates. See Sanchez,* No. 3652 of 2001, *slip op.* at 13 ("In this case, crucial information of an extremely violent killing was provided by the informant and the police were able to verify it, all as explained in the affidavit.").

Concerning the alleged failure of police to knock and announce their presence prior to entering the room in which Appellant and Young were located, the court found as a fact based upon the suppression record that the room's door was already partially opened by Appellant before the police entered, and the police "announced their presence repeatedly as they approached." *Sanchez,* No. 3652 of 2001, *slip op.* at 16. Citing *Commonwealth v. Days,* 718 A.2d 797, 801 (Pa.Su-

---

4. *See* Affidavit of Probable Cause at 1 ("The victim was found suffering from multiple blunt force injuries to the head and a slice injury to the throat.... [The witness] said that Ramon Sanchez confronted the victim in the front room of the home and at such time cut the victim's throat with a gray boxcutter type knife. As she fled the home she saw that Ramon Sanchez had a hammer in his hand and was struggling with the victim."); *id.* ("After the incident Mr. Sanchez ... disposed of bloody clothing in the 1000 or 1100 [block] of Allen St. [A detective] subsequently recovered the aforementioned bloody clothing in a trash can on Allen St.").

per.1998) (holding that when a defendant "knew the existence, identity and purpose of the police officers, it would be pointless for the officers to stop on the way into the residence to knock on the door"), and *Commonwealth v. Chambers,* 528 Pa. 403, 409, 598 A.2d 539, 541 (1991) (explaining that police are not required to engage in futile gestures in executing a search warrant), the court determined that all relevant procedural and constitutional requirements were met. Specifically, the court explained:

> In this case, the police were attempting to execute the validly issued warrant in a rooming house which was hectic with activity from others unrelated to the case. Based on what two officers on the scene told them earlier, the other officers were concerned that their presence was detected well in advance of the planned time for the search. The door to Room 8 was partially open with [an officer] outside the door and the defendant inside the door. [Another officer] believed defendant was attempting to leave. The police announced their presence repeatedly as they approached the open door.
>
> The police had reason to believe, from the reliable informant AnnJulie Torre[z], that the defendant was armed with a hand gun. The defense was accurate that a hand gun was not recovered; however, Torre[z] gave accurate information about the crime scene, the fatal injuries to Lloyd Gehret and the location of the bloody clothes blocks from the murder scene. They reasonably proceeded that evening as though the occupants were armed.
>
> Under all of these circumstances, the police were justified in dispensing with a formal "knock and announce." They announced their identities vigorously and repeatedly as they approached the open door. The defendant and Young were on the opposite side of the partially open door. All of the concerns that "knock and announce" was designed to address were absent from this scene.

*Sanchez,* No. 3652 of 2001, *slip op.* at 18.

As to the competency issue, the trial court explained that it conducted a lengthy pre-trial hearing and assessed the several

competency evaluations that were offered by the parties according to the legal standard precluding trial of one who is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense. *See* 50 P.S. § 7402(a); *accord Commonwealth v. Hughes*, 521 Pa. 423, 435–36, 555 A.2d 1264, 1270 (1989). Further, the court noted that it was to view the evidence in light of the applicable presumption of competency, *see Commonwealth v. duPont*, 545 Pa. 564, 568, 681 A.2d 1328, 1330 (1996), and to allocate the burden of proof to establish a lack of competency to the defendant. *See* 50 P.S. § 7403(a).

The trial court also indicated that, particularly since the issue of competency was raised early in the proceedings, it had been vigilant in observing Appellant for signs of incompetency and, with once exception, he never gave any reason to doubt his ability to reasonably and rationally consult with his attorney and to understand the significant aspects of the proceedings.[5] The court proceeded to recount various of its observations of Appellant's active and meaningful participation in the defense. *See Sanchez*, No. 3652 of 2001, *slip op.* at 43–45. In addition, it relied substantially upon the pre-trial testimony of a treating psychiatrist and the Commonwealth's expert to the effect that Appellant was competent to be tried consistent with the governing legal standard. *See id.* at 45–51.[6]

---

**5.** According to the trial court, the exception occurred upon the advice of Appellant's attorney that Appellant was unable to communicate, which, in his opinion, resulted from over-medication. The result was the finding of incompetency by a mental health professional and Appellant's involuntary commitment to a psychiatric hospital, during which period he underwent further evaluation and his medication was adjusted. *See Sanchez*, No. 3652 of 2001, *slip op.* at 43.

**6.** The treating psychiatrist, Dr. Mangala Khadilkar, testified that Appellant did not exhibit any observed psychotic symptoms, although he reported hallucinations. *See* N.T., February 19, 2003, at 104. Upon his discharge, she offered a diagnosis of adjustment disorder with anxiety, polysubstance dependency, and anti-social personality disorder. *See id.* at 111. She described Appellant as alert and oriented, *see id.* at 116, and expressed the opinion that he was able to understand the charges against him and assist in his own defense. *See id.* at 120–23. The Commonwealth's expert psychiatrist, Dr. Timothy Michals, testified that he interviewed and examined Appellant, and that he concluded that Appellant was manipulating test results and malingering. *See id.*

Finally, with regard to the admission of Appellant's statement that "[t]his is my 17th body," the trial court referenced the Commonwealth's use of the testimony to explain the delay on the party of Young and Torrez in reporting of the killing, as well the court's own decision that the evidence could be considered as reflecting Appellant's state of mind as of the time of the killing. *See Sanchez*, No. 3652 of 2001, *slip op.* at 52–54, 57. The court explained that it weighed the probative value of the evidence on these terms against the potential for unfair prejudice. In the latter regard, the court believed that it was unlikely that the jurors would regard the statement as true, particularly given that Appellant was nineteen years old at the time that he made the statement. *See id.* at 55–56. In terms of the alleged discovery violation, the trial court made the following factual findings, with reference to the record of the post-sentence hearing:

1. During the police investigation, the investigating officers did not know that Young and Torre[z] heard a statement from the defendant about the 17th body.

2. The subject of the 17th body was not addressed in any police reports and was not found in notes prepared by police.

3. The first time that ... one of the police investigators[ ] learned of the 17th body statement was just prior to the first trial listing in August, 2002, or just prior to the second trial listing in February, 2003.

4. The first time that ... [the lead] investigator[ ] heard anything about the 17th body was during trial testimony. [He] did not recall which witness gave the testimony pertaining to the 17th body.

5. The first time that the assistant district attorney learned of the 17th body statement was during inter-

at 216–28. The defense presented testimony from psychologist Robert M. Gordon, PhD, who conceded that there may have been a malingering component to Appellant's behavior, but he nevertheless described Appellant as confused and disorganized, suffering from a longstanding pattern of psychosis, and incompetent to stand trial. *See* N.T., February 11, 2003, at 28, 34, 45.

views he conducted with Young and Torre[z] during trial preparation.

6. Immediately before the first trial listing in August of 2002, the assistant district attorney ... revealed to defense counsel ... that Young and Torre[z] claimed that the defendant made the 17th body statement to them. The revelation of this information took place when the prosecuting attorney and the defense attorney spoke in the lavatory.

7. Defense counsel did not recall having that conversation with the prosecuting attorney in the lavatory.

*Sanchez*, No. 3652 of 2001, *slip op.* at 57–58; *see also id.* at 59 ("My finding is that the assistant district attorney revealed the statement in the lavatory ...."); *accord* N.T., November 10, 2003, at 47–49 (testimony of Assistant District Attorney Matthew Weintraub). Since the court found that disclosure had occurred, it concluded there was no discovery violation. *See id.* ("Accordingly, although the method of discovery in this instance was less than exemplary and is not to be repeated, there was compliance with the discovery obligation.").

Appellant subsequently filed a notice of appeal, and he has maintained the claims discussed above in his appellate brief.

 We begin our review with an examination of the sufficiency of the evidence, as is required in all capital cases. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982). To establish the offense of first-degree murder, the Commonwealth must prove the fact of the killing and the defendant's involvement, and it must establish malice and specific intent to kill on the part of the defendant. *See Commonwealth v. Collins*, 550 Pa. 46, 50, 703 A.2d 418, 420 (1997). In the sufficiency assessment, the evidence is viewed in the light most favorable to the Commonwealth, as verdict winner. *See id.*

 Here, the evidence offered at trial by the Commonwealth is plainly sufficient to support the convictions and death sentence. The Commonwealth presented expert testimony from a forensic pathologist concerning her examination

of the victim's body and her opinion that the cause of death was homicide. Testimony from eyewitnesses Young and Torrez directly implicated Appellant as the killer, and this was corroborated by substantial physical evidence, including police testimony that Appellant's palm print was found at the scene of the killing. Indeed, Appellant's physical perpetration of the killing was uncontested at trial.[7] The manner in which Appellant accosted the victim, cut his neck, and bludgeoned him severely and repeatedly on the head with a hammer serves as circumstantial evidence of malice and intent to kill on Appellant's part. *See Collins*, 550 Pa. at 51, 703 A.2d at 420 ("Specific intent to kill may be proven by circumstantial evidence, such as the accused using a deadly weapon on a vital part of the victim's body."). Moreover, the Commonwealth presented evidence that Appellant had expressed an intention to kill Mr. Gehret to Young and Torrez prior to the murder. *See* N.T., March 6, 2003, at 142 (testimony of Young); N.T., March 7, 2003, at 59 (testimony of Torrez). As concerns robbery as the basis for the jury's finding of the in-perpetration-of-a-felony aggravator, Young described her observation of Appellant taking the victim's wallet; the wallet was found in the room with Appellant where he was arrested; and this evidence was incorporated into the penalty phase of trial.

Appellant maintains his claim that the death penalty is unconstitutional as applied in Lehigh County, because the district attorney's office purportedly exercises "unfettered discretion" in selecting among cases in which to pursue the imposition of capital punishment. Appellant reiterates, without providing affirmative evidentiary support, that there is some evidence that decisions may be being made based upon race. Appellant again references the five unpublished cases litigated in Lehigh County, in which the defendant was Caucasian and at least one aggravating circumstance appeared to be present, but the death penalty was not pursued. *See supra* note 2. Further, Appellant restates his position that his coun-

---

7. Appellant's strategy was to pursue a lesser degree of culpability based on his having been apprised prior to the killing of advances made by the victim toward his sister and girlfriend.

sel requested from the district attorney information regarding all capital cases pursued since 1990 in Lehigh County, and an assistant district attorney initially indicated that the information would be provided, but that later the request was refused.

The Commonwealth replies that the use of aggravating factors in determining death eligibility has been held to be constitutionally sound, *see Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), and there is no authority that would support a practice of preventing the government from exercising discretion in the appropriate allocation of its resources with regard to death-eligible defendants. *Cf. McCleskey v. Kemp*, 481 U.S. 279, 295 n. 15, 107 S.Ct. 1756, 1768–69 n. 15, 95 L.Ed.2d 262 (1987) (observing that prosecutors are independently elected officials whose "decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations"). The Commonwealth references the relevant decisions of this Court to the effect that a substantial, affirmative showing is required to advance a claim of prosecutorial abuse of discretion in the selection of cases in which the death penalty will be sought, *see, e.g., Hardcastle*, 519 Pa. at 258, 546 A.2d at 1111, and observes that Appellant's bare allegations and anecdotal references to selected cases are plainly insufficient to meet this burden.

We agree with the position of the trial court and the Commonwealth that the discrete and anecdotal information that Appellant has presented is insufficient to establish anything about the Lehigh County District Attorney's decisions concerning the death penalty and facially does not meet the threshold showing required under *Hardcastle*. Appellant's remaining complaint about the Commonwealth's refusal to assemble information concerning selection decisions across a broad range of cases also affords no basis for relief. In this regard, Appellant does not aver that the information is within the exclusive control of the district attorney,[8] does not address

---

8. Appellant does not contradict the trial court's observation that the sought-after information is available to the public in the office of the Clerk of Courts. *See Sanchez*, No. 3652 of 2001, *slip op.* at 20.

the trial court's finding that there was no agreement on the part of the Commonwealth to produce such data, and does not provide any authority to support the proposition that the Commonwealth has a legal obligation to assemble the requested information on his behalf.

■ Next Appellant sets out his argument that the juror selection process in Lehigh County violates his right under the Sixth Amendment to the United States Constitution to an impartial jury, on the allegation that Hispanics are arbitrarily excluded from jury pools. As he did in the trial court, Appellant effectively concedes that he cannot satisfy his burden of proof with regard to the requirements to show unreasonable and unfair under-representation resulting from systematic exclusion, *see Lopez*, 559 Pa. at 149–50, 739 A.2d at 495. *See* Brief for Appellant at 14–15. He attributes such inability to the Lehigh County court system, however, because it has not consistently solicited information regarding the ethnic and racial backgrounds of all jurors responding to questionnaires or retained a historical account concerning the limited information that it has collected. The Commonwealth highlights *Lopez's* finding that the license-based venire process employed by Lehigh County is constitutional. Further, the Commonwealth observes that, by Appellant's own admission, he cannot meet at least one of the factors necessary to support a claim of constitutional significance, and that Appellant offers no authority that would implicate a duty on the part of the county court system to track and maintain the information that he seeks.

The trial court and the Commonwealth are correct in all material respects as concerns this claim, which does not support an award of relief in light of Appellant's failure of proof and in view of *Lopez*.

■ Appellant next challenges the validity of the search warrant executed at the boarding house where Appellant and Young were found by police, asserting essentially the same grounds as he pursued in the trial court. The Commonwealth relies on the trial court's assessment that the affidavit of

probable cause reflected significant corroboration of aspects of the statement of the supporting witness, Torrez, *see supra* note 4, thus demonstrating sufficient reliability. The Commonwealth also relies on the trial court's factual findings with regard to the knock-and-announce claim.

As Appellant acknowledges and the Commonwealth highlights, the corroboration by independent police activity of significant details from Torrez's statement supports a reasonable inference that she had a basis for knowledge concerning the killing and the activities of the perpetrators, whether or not she was identified in the affidavit of probable cause by name. We disagree with Appellant's contention that corroboration is required concerning every significant detail, including the then-present location of Appellant and Young. *Accord United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir.2000) ("[I]nformation received from an informant whose reliability is not established may be sufficient to create probable cause where there is some independent corroboration by police of the informant's information."). Here, we find that the trial court reasonably concluded that the corroboration of significant details from Torrez's statement as disclosed in the affidavit of probable cause meets the *Gates* threshold.

■ Next, Appellant maintains that the police violated the knock-and-announce rule when executing the search warrant. According to Appellant, there was no announcement of police presence prior to a forced entry by a non-uniformed officer into the room. The Commonwealth recognizes that police did not knock and announce their presence in a way that was fully in accordance with the general rule articulated within Rule of Criminal Procedure 207, but contends that police conduct fell within exigent circumstances, safety, and futility exceptions.[9]

9. The trial court also indicated that Appellant failed to present any evidence to demonstrate a legitimate expectation of privacy in the room where he was arrested, and therefore, he lacked standing to pursue suppression. The Commonwealth, however, has not advanced this point in this appeal, and, given our disposition of the arguments that are presented, there is no need to address it here.

 Pennsylvania Rule of Criminal Procedure 207 requires that law enforcement officers give, or make a reasonable effort to give, notice of their identity, authority, and purpose to the occupant of the premises, unless exigent circumstances require immediate forcible entry. *See* Pa. R.Crim.P. 207. The rule is designed to promote peaceable entry by affording fair warning, and to safeguard legitimate privacy expectations to the degree possible. *See Commonwealth v. Morgan,* 517 Pa. 93, 97, 534 A.2d 1054, 1056 (1987). The procedural rule subsumes the Fourth Amendment requirement that officers must announce their presence upon the execution of a search warrant and provide residents with some chance to open the door. *See Hudson v. Michigan,* —— U.S. ——, ——, 126 S.Ct. 2159, 2162–63, 165 L.Ed.2d 56 (2006). The federal constitutional scheme contains exceptions that are consistent with the exigent circumstances approach in our Criminal Rules, for situations presenting risks of physical violence, in which there may be reason to believe that evidence may be destroyed, and where announcement would be futile. *See id.* Further, the United States Supreme Court has required only that police maintain a reasonable suspicion that one of these grounds is present, and the Court has indicated that " '[t]his showing is not high.' " *Id.* (quoting *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 1422, 137 L.Ed.2d 615 (1997)).

 The findings of the trial court reflect both that the executing officers in this case did make an effort to announce their presence, and that sufficient exigent circumstances were present to justify their entry on less than full compliance with the general rule set forth within Rule 207.[10] The relevant circumstances include: the severity of the crimes under investigation; the information from a source who had supplied relevant, corroborated details that the killer was located in the room; the indication from the source that Appellant was

10. In the suppression context, where the findings of the trial court are supported by the record, the appellate courts are generally bound by them and free to reverse only if derivative legal conclusions are in error. *See Commonwealth v. Boczkowski,* 577 Pa. 421, 446, 846 A.2d 75, 89 (2004).

armed; the indications that occupants of the building had identified police and were reacting to their presence; the open door behind which Appellant stood, with officers believing that he was attempting to leave; and the conduct of police emergency response team members in announcing their presence as they approached the door. In the circumstances, we agree with the trial court and the Commonwealth that suppression was not required.

 Appellant next contends that the trial court erred in finding him competent to stand trial. Appellant highlights that, at one point, he was deemed incompetent by a court-appointed mental health professional and was involuntarily committed. He also emphasizes the testimony of a defense expert that he remained incompetent to stand trial following his treatment and adjustment of his medication. Appellant argues:

> The court chose to credit the testimony of [Appellant's treating psychiatrist and the Commonwealth's expert], while the expert with the most direct contact, the most history, and the most objective testing, [the defense expert,] was not given credence. All of the experts testified that if Mr. Sanchez was in fact mentally ill, that it was necessary for him to take his medication to maintain his competence, and Mr. Sanchez produced evidence that he was not taking his medication as prescribed.

Brief for Appellant, at 20–21.

The Commonwealth relies on the presumption of competency, the fact that it is the defendant's burden to show otherwise, and the repositing of the determination of competency within the sound discretion of the trial court. *See Commonwealth v. Sam*, 535 Pa. 350, 357, 635 A.2d 603, 606 (1993); *accord Commonwealth v. Chopak*, 532 Pa. 227, 235, 615 A.2d 696, 700 (1992) (explaining that the sensitive nature of the competency issue requires that a trial judge's conclusions be afforded great deference, because the judge had the opportunity to personally observe a defendant's behavior). Further, the Commonwealth observes that, when making a competency

determination, a trial court may resolve conflicts in the testimony of expert witnesses, accepting one opinion over another where the record adequately supports it. *See Commonwealth v. Banks,* 513 Pa. 318, 341–42, 521 A.2d 1, 12–13 (1987). It is the Commonwealth's position that this is precisely what occurred here. With regard to the allegation that Appellant was not taking his medication, the Commonwealth develops the details of the relevant incident. Apparently, Appellant attempted to demonstrate in the courtroom that he was not taking his medicine by openly displaying it. *See* Brief for Appellee at 24. The Commonwealth also references the trial court's relevant findings as showing that Appellant's conduct was an intentional effort to manipulate the proceedings, and that Appellant was not automatically rendered incompetent by his deferring the taking of the medication. *See id.*

Again, implementing the undisputed review standards that afford substantial deference to the findings of the trial court, we agree with that court and the Commonwealth that there was no abuse of discretion connected with the competency determination. The record, and primarily the testimony of Appellant's treating psychiatrist and the Commonwealth's expert, amply supports the trial court's findings, *see supra* note 6, as do the trial judge's extensive personal observations of Appellant, which are reflected in his opinion.

 Appellant's final argument is that the trial court erred in refusing to grant a mistrial following the introduction of his statement concerning the "seventeenth body." Appellant invokes Rule of Criminal Procedure 573(B), which requires disclosure by the Commonwealth of the substance of inculpatory statements. *See* Pa.R.Crim.P. 573(B). After setting out the background for the claim, Appellant's argument proceeds as follows:

An offer of proof during the trial showed that the Commonwealth was in possession of a number of statements which they planned to use against [Appellant] which were not disclosed until just prior to their intended use, and then only because of the "seventeenth body" statement. The other statements included, "do you want to see me kill him"

allegedly made by [Appellant] to [Torrez], "that felt good" allegedly made by [Appellant] to [Torrez] and [Young] after the killing, and "I'll never get caught" allegedly made by [Appellant] in conjunction with the "seventeenth body" statement.[11] It was admitted that it was the intention of the Commonwealth to elicit the statements from [Torrez], even thought the attorney for the Commonwealth admitted that he had no recollection of disclosing the statements to the defense. These were all statements with the potential negative effect on the defense, none of which were disclosed. It[ ] borders on prosecutorial misconduct.

Brief for Appellant at 23–24. Appellant thus appears to be disputing the trial court's factual finding that pre-trial disclosure of the "seventeenth body" statement actually was made by the Commonwealth.[12]

The Commonwealth, for its part, relies on the trial court's factual finding. To the degree that Appellant is arguing that the probative value of the evidence was outweighed by its prejudicial effect, the Commonwealth's argument parallels the trial court's assessment of the impact of the evidence on those terms.

The denial of a motion for a mistrial is assessed on appellate review according to an abuse of discretion standard. *See Commonwealth v. Savage*, 529 Pa. 108, 116, 602 A.2d 309, 312 (1992). The central tasks confronting the trial court upon the making of the motion were to determine whether misconduct or prejudicial error actually occurred, and if so, to assess the degree of any resulting prejudice. *See generally Commonwealth v. Boczkowski*, 577 Pa. 421, 454, 846 A.2d 75, 94 (2004) (characterizing a mistrial as an extreme remedy that needs only be granted where a prejudicial event may reasonably be said to have deprived the defendant of a fair trial). Again, Appellant's primary argument appears to be that the

11. The trial court refused to allow the admission of these statements, in view of the Commonwealth's apparent nondisclosure. *See* N.T., March 6, 2003, at 211–14; N.T., March 7, 2003, at 11–27.

12. Appellant does not contend that the prosecutor's actual notes from his interviews with Young and Torrez were subject to disclosure.

trial court should not have accepted the district attorney's representation that the "seventeenth body" statement was disclosed to the defense prior to trial, particularly given the asserted manner of disclosure (*i.e.*, orally, in a lavatory). On the issue of whether or not disclosure occurred, the trial court functions as fact-finder, and the appellate courts generally do not substitute their judgments for those of a fact-finder in matters of credibility. *See, e.g., Commonwealth v. Gibson*, 553 Pa. 648, 664, 720 A.2d 473, 480 (1998).

We acknowledge Appellant's points that the circumstances under which the trial court found that disclosure occurred were unusual, and that the Commonwealth's apparent withholding of other, similar inculpatory statements by Appellant would tend to support a finding of non-disclosure with regard to the "seventeenth body" statement as well. Further, we agree with the trial court that the method of disclosure was "less than exemplary" and should not be repeated. Nonetheless, based on the well-established, applicable review standards, we decline to disturb the trial court's credibility judgment. To the extent that Appellant's argument implicates the balancing of the probative value of the statement against its potential for unfair prejudice, we also find no abuse of discretion on the part of the trial judge, who issued appropriate cautionary instructions, and whose judgment as to the impact of the evidence was rendered from his comparatively closer vantage point relative to its presentation.

Finally, consistent with Section 9711(h) of the Judicial Code, 42 Pa.C.S. § 9711(h), and having reviewed the record presented, we are satisfied that the sentence of death was not the product of passion, prejudice, or any other arbitrary factor.

The judgment of sentence is affirmed.[13]

Justice CASTILLE, EAKIN and BAER join the opinion.

13. The Prothonotary is directed to transmit the complete record of this case to the Governor of Pennsylvania within the timeframe designated by the Legislature. *See* 42 Pa.C.S. § 9711(i).

Former Justice NIGRO did not participate in the consideration or decision of this case.

Justice NEWMAN files a concurring opinion in which Chief Justice CAPPY joins.

Justice NEWMAN, concurring.

I join the Majority Opinion but write separately to articulate my dissatisfaction and concern regarding the manner in which the Commonwealth effectuated pre-trial disclosure of the "seventeenth body" statement of Appellant. Upon leaving the scene of the crime with Sashana Young and AnnJulie Torres, Appellant uttered this statement, saying "[t]his is my seventeenth body, I'll never get caught."

The Commonwealth notes that it disclosed the seventeenth body statement to defense counsel "while on a bathroom break at some point before the first trial listing of this case in August 2002." Brief for Appellee at 28 (citing N.T. 11/10/03 at 37). My concern is compounded further by the fact that the trial court found that "[d]efense counsel did not recall having that conversation with the prosecuting attorney in the lavatory." Trial Court Opinion at 58.

The trial court described the Commonwealth's mode of disclosure as "less than exemplary," and the Majority portrays it as "unusual." I find these descriptions to be charitable. In my opinion, the Commonwealth's compliance with the mandatory disclosure rule was serendipitous at best, having occurred during a bathroom break when defense counsel's visit happened to coincide with that of the prosecutor.

I am troubled by the fact that in addition to the "seventeenth body" statement, there were other instances of undisclosed prejudicial statements of Appellant: "the Commonwealth's apparent withholding of other, similar inculpatory statements by Appellant would tend to support a finding of non-disclosure with regard to the 'seventeenth body' statement as well." Majority Opinion at 22.

The Commonwealth admitted that it knew of other detrimental statements made by Appellant to AnnJulie Torres or

Sashana Young, none of which it disclosed to defense counsel: (1) "Do you want to see me kill him?"; (2) "I have to finish this"; (3) "That felt good"; and (4) other statements made in the holding cell at the Allentown Police Department. Brief of Appellee at 29.

Pa.R.Crim.P. 573(B) provides, *inter alia,* for mandatory disclosure:

1) *Mandatory.* In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

* * *

(b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth[.]

As the Majority acknowledges, the fact that there were other undisclosed damaging statements makes Appellant's contention that the "seventeenth body" statement was not disclosed to counsel more credible than it might be otherwise. In this same vein, the fact that defense counsel does not remember being told about the "seventeenth body" statement buttresses the claim of Appellant of a disclosure violation. Further, the explanation of the prosecutor as to why he did not turn the statements over to defense counsel is also troubling: "the majority of discovery had been provided before [I] was assigned the case [and] it was my impression that [defense counsel] had—you had the substance of what occurred. You did not have my notes." Brief for Appellee at 29, 30 (citing N.T. 11/10/03 at 61).

Although I have a high degree of skepticism regarding the Commonwealth's compliance with Pa.R.Crim.P. 573(B), I agree with the disposition of the Majority for the following reasons: (1) the trial court properly weighed the probative value of the evidence against its potential for unfair prejudice; (2) the trial court made factual findings that supported the position of the Commonwealth that it disclosed the "seventeenth body" statement in the lavatory, and, because the trial court is the fact-finder, we accord deference to its findings with respect to credibility, *Commonwealth v. Gibson*, 553 Pa. 648, 720 A.2d 473, 480 (1998); (3) the trial court's curative instructions to the jury were appropriate and adequate; (4) the trial court's decision to deny the remedy sought by Appellant of a mistrial was within its discretion, *Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334, 342 (1987); and (5) even assuming that the trial court erred in permitting testimony regarding the "seventeenth body," the error was harmless because of the overwhelming evidence of Appellant's guilt, *Commonwealth v. Morris*, 513 Pa. 169, 519 A.2d 374 (1986).

Finally, I note that Appellant did not provide any legal support for his argument that the "seventeenth body" statement violated the disclosure rule, offering only the bald assertion that "[t]hese were all statements with the potential negative effect on the defense, none of which were disclosed. Its [sic] borders on prosecutorial misconduct." Brief for Appellant at 23–24.

Accordingly, I join the Majority in affirming the judgment of sentence.

Chief Justice CAPPY joins this concurring opinion.