J-A33028-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| WP 940 ASSOCIATES, L.P., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| DAVID A. BOTTGER, M.D., | : | |
| | : | |
| Appellee | : | |
| | : | |
| | : | No. 1139 EDA 2014 |

Appeal from the Judgment Entered April 22, 2014
in the Court of Common Pleas of Delaware County,
Civil Division at No(s):  09-4706

BEFORE:  LAZARUS, WECHT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:　　　　　**FILED MARCH 05, 2015**

WP 940 Associates, L.P. (WP 940) appeals from the judgment entered against it and in favor David A. Bottger, M.D. (Bottger).  After careful review, we reverse in part the order denying WP 940's post-trial motion, vacate the judgment, and remand for the trial court to enter judgment consistent with this memorandum.

The trial court set forth the following summary, taken from the evidence in the non-jury trial in this case.

> WP Realty, Inc. is a commercial real estate company which owns and manages commercial real estate with, at the times relevant to this matter, a market value of approximately $1.4 billion.  WP Realty, Inc., through one of its affiliated entities, and agents, [WP 940,] purchased the subject property located at 940 Haverford Road, Bryn Mawr, Delaware County, Pennsylvania ("Bryn Mawr Plaza" or the "Complex" or "Leased Premises") in

---

* Retired Senior Judge assigned to the Superior Court.

April 2004 for the purpose of eventually locating its corporate offices to that location. [Bottger] is a medical doctor and specifically a plastic surgeon who has been practicing medicine for 23 years. On March 22, 1996, [Bottger] entered into a certain lease agreement (the "Lease") for the rental of approximately 3,016 square feet of office space at Bryn Mawr Plaza.

In April of 2004, [WP 940,] as agent for WP Realty, Inc., purchased the subject office building in which [Bottger] was a tenant. In 2006, WP Realty, Inc., systematically concluded lease relationships with tenants William Wurster, Suzanne Slenn and Slenn Studio LLC, and Philadelphia Ballet Studio, with a plan to occupy the entire building as the WP Realty, Inc., corporate offices. In the summer of 2006, Bryan Weingarten ("Mr. Weingarten"), the Chief Executive Officer of WP Realty, Inc., and apparently of [WP 940,] asked [Bottger] if he would relocate his medical practice early, before the end of his Lease, so that WP Realty, Inc. could take over the Leased Premises for its corporate use. When Mr. Weingarten approached [Bottger] asking him to vacate the Leased Premises early, the Lease term was to run through and including February 28, 2011. At the time of Mr. Weingarten's solicitation in mid-2006, [Bottger] did not intend to leave the Leased Premises, but Mr. Weingarten made it clear that the Lease would not be renewed. [Bottger] had built a successful plastic surgery medical practice at the Leased Premises and had no desire to leave the Leased Premises or Bryn Mawr, Delaware County, Pennsylvania which was an ideal geographical location for his medical specialty.

In mid-2006, [Bottger] agreed to relocate, and Mr. Weingarten and [WP 940] provided [Bottger] relocation assistance in the form of property leads for his medical practice. Immediately after agreeing to Mr. Weingarten's proposal, [Bottger] began the search for a new medical practice location, both through his personal efforts and with the assistance of [WP 940]. Over the next two years, [WP 940], through Mr. Weingarten and a manager, Daniel Mortimer ("Mr. Mortimer"), assisted [Bottger] in his effort to relocate the plastic surgery medical practice.

[Bottger] entered into a lease with Main Line Hospitals, Inc., for new office space in Newtown Township, Delaware County, Pennsylvania, on June 17, 2008 (the "Lease for New

- 2 -

Office Space"). At no time following Weingarten's solicitation until [Bottger] signed the Lease for New Office space did [WP 940] inform [Bottger] to stop his effort to surrender the Leased Premises, early.

In late June 2008, according to Mr. Weingarten, [WP 940] first informed [Bottger] that [WP 940] objected to [Bottger's] early surrender of the Leased Premises and demanded strict performance of the Lease. By then, [Bottger] had signed the Lease for New Office Space and incurred substantial costs, expenditures and financial obligations to arrange the relocation of his medical practice to Newtown Township, Delaware County, Pennsylvania.

Following Mr. Weingarten's late June 2008 demand for [Bottger's] performance under the Lease, [Bottger] spoke to Mr. Mortimer of [WP 940]. [Bottger] confirmed his conversation with Mr. Mortimer in a memorandum, and then on July 3, 2008, sent a letter to Mr. Weingarten confirming the agreement Weingarten solicited of [Bottger] during the summer of 2006 and requesting reconsideration.

On February 28, 2009, in reliance upon Weingarten's 2006 solicitation, [Bottger] surrendered the Leased Premises, along with the value he had developed in his Bryn Mawr plastic surgery practice, and relocated to the New Office Space in Newtown Township, Delaware County, Pennsylvania.

In March 2009, a dermatology medical practice, Haverford Dermatology, took possession of the Leased Premises pursuant to a lease agreement it entered with [WP 940]. Haverford Dermatology occupied the Leased Premises without any change to the floor plan of what had been [Bottger's] medical office. A clear inference from WP 940's evidence, specifically the testimony of Mr. Rosenberg, General Legal Counsel, was that the lease between Haverford Dermatology and [WP 940] was for a term of years continuing significantly beyond February 28, 2011.

Trial Court Opinion, 7/14/2014, at 6-9 (citations omitted).

On April 6, 2009, WP 940 filed a complaint in confession of judgment against Bottger in the Court of Common Pleas of Delaware County.

- 3 -

According to the complaint, because Bottger breached the lease agreement, Bottger owed WP 940 for rent from the time he vacated the premises on February 28, 2009 through the expiration of the lease on February 28, 2011. The total amount of the confessed judgment was $138,438.44, which, pursuant to the lease, included attorneys' fees. On May 6, 2009, Bottger filed a petition to strike and/or open the confessed judgment and for a stay of proceedings. WP 940 filed a response, and on August 7, 2009, after a hearing, the trial court opened the judgment.

After discovery was conducted, a non-jury trial was held on November 12 and 13, 2013. With respect to WP 940's breach of contract claim against Bottger, the trial court found in favor of Bottger and against WP 940. The trial court also awarded damages to Bottger on his purported counterclaims in the amount of $428,779.44. Finally, on Bottger's purported claim for negligent misrepresentation, the trial court found in favor of WP 940 and against Bottger.

WP 940 timely filed a post-trial motion, which included, *inter alia*, a claim that the trial court erred in permitting evidence of counterclaims that had not been pled properly. That motion was denied on March 26, 2014, and this timely appeal followed. The trial court ordered WP 940 to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925, and WP 940 timely filed its statement.

On appeal, WP 940 sets forth five issues for our review, which we have reordered for ease of disposition.

> 1. Whether a court is precluded from granting relief based upon counterclaims which were not [pled] in the petition to open a confessed judgment, were not otherwise [pled] by an amendment to a petition to open a confessed judgment, were not asserted in any other legal proceeding between the parties, and which are barred by the statute of limitations.

> [2]. Whether a tenant is precluded from recovering damages incurred to relocate to alternate leased premises prior to the end of a lease where the tenant admits that the tenant was able to remain in the original leased premises until the end of the original lease term without any interference from the landlord.

> [3]. Whether a party is precluded as a matter of law under the gist of the action doctrine from introducing evidence of damages for negligent misrepresentation where the party's claim for misrepresentation relates to the performance of a contract.

> [4]. Whether a party should be barred from introducing evidence and obtaining relief from the party's default under a contract where the contract is subject to the statute of frauds and the party's defense of estoppel cannot be used to circumvent the statute of frauds.

> [5]. Whether a judgment for amounts due under a lease should remain undisturbed (other than to amend the judgment amount) where the lease is subject to the statute of frauds and the only defense to the judgment would violate the statute of frauds.

WP 940's Brief at 5-6 (trial court answers omitted).[1]

WP 940's first four issues concern the trial court's award of damages in favor of Bottger and against WP 940 in this action. In determining that

---

[1] With respect to issue 3, regarding damages for negligent misrepresentation, the trial court did not award Bottger any damages on this basis; so this issue is moot.

- 5 -

Bottger was entitled to damages, the trial court reached several conclusions. First, the trial court held that "Bottger properly raised several counterclaims stemming from the alleged wrongful conduct of WP 940[.]" Trial Court Opinion, 7/14/2014, at 15. As part of these purported counterclaims, the trial court "found the evidence presented by [Bottger] to be clear and convincing proof in support of the Doctrine of Equitable Estoppel." *Id*. at 17. Moreover, based on these equitable considerations, the trial court held that "the statute of frauds not be enforced." *Id*. at 18. Finally, the trial court awarded "reliance damages" to Bottger for "his expenditures made in performance of the Lease as modified by estoppel, less the loss [Bottger] with reasonable certainty would have suffered had the Lease as modified been performed." *Id*. at 20-21.

First, we consider WP 940's contention that Bottger's petition to strike and/or open the confessed judgment did "not allege any counterclaims" nor did it "allege any demands for damages or monies purportedly due and owing to" him and therefore an award of damages of any sort in favor of Bottger was improper. WP 940's Brief at 20 (emphasis in original).

The trial court concluded that Bottger "properly raised several counterclaims stemming from the alleged wrongful conduct of" WP 940. Trial Court Opinion, 7/14/2014, at 15. In support of this determination, the trial court pointed to numerous paragraphs in Bottger's petition to open and/or strike the confessed judgment. The trial court further concluded that the

counterclaims were proper because they were addressed "in response to [WP 940's] specific Interrogatories on the issue in November 2009." *Id*.

> Petitions to strike or open judgment by confession are governed by Pennsylvania Rules of Civil Procedure 2959 and 2960.
>
> > Relief from a judgment by confession shall be sought by petition. Except as provided in subparagraph (2), all grounds for relief whether to strike off the judgment or to open it *must be asserted in a single petition*.
>
> Pa.R.C.P. 2959(a)(1) (emphasis added); *see also* Pa.R.C.P. 2959(a)(2) (permitting a further, limited request for a stay of execution on due process grounds); Pa.R.C.P. 2959(c) ("A party waives all defenses and objections which are not included in the petition or answer."); Pa.R.C.P. 2960 (limiting the scope of proceedings upon opening of judgment).

*Huntingdon Nat. Bank v. K-Cor, Inc.*, __ A.3d __, 2014 WL 7447667, at *2 (Pa. Super. 2014).

We examine *J.M. Korn & Son, Inc. v. Fleet-Air Corporation*, 446 A.2d 945 (Pa. Super. 1982) for guidance. In that case, J.M. Korn & Son, Inc. (J.M. Korn) confessed judgment against Fleet-Air Corporation (Fleet-Air). Fleet-Air filed a petition to open the judgment, alleging a defense of partial payment. J.M. Korn filed an answer conceding that payments had been made, and the parties agreed to open the judgment. The trial court issued an order opening the judgment and granted the parties leave to amend their pleadings to include "any other claims, defenses or counterclaims arising out of the parties' contractual advertising arrangement." *J.M. Korn*, 446 A.2d at 946. J.M. Korn filed a notice of

appeal from that order complaining that the trial court erred in permitting the parties to amend their pleadings. This Court held that the issues for trial

> were framed by [J.M. Korn's] complaint, which had been filed with the judgment notes, and by [Fleet-Air's] petition to open and [J.M. Korn's] answer thereto. Although clarifying amendments to these pleadings may be filed, if necessary and otherwise proper, it would be improper for [Fleet-Air] after judgment had been opened, to amend its petition to assert new defenses or counterclaims. To the extent that the trial court's order allowed such amendments, it was erroneous.

*Id*. at 947. Consequently, once the judgment is opened, the issues for trial are limited to those specifically included in the complaint, petition, and any amendments thereto.

> While a counterclaim is not a ground to open a confessed judgment, it may be determined in subsequent proceedings if the counterclaim is added to the petition to open judgment by amendment before the judgment is opened. Such an amendment must be made before the order opening the judgment is entered. The issues to be tried thereafter are properly framed by the original complaint, filed with the judgment notes, and by the petition to open and the answer thereto, including any claims, defenses, or counterclaims pleaded in the petition to open judgment. It is proper to include new matter and a counterclaim in the petition to open or strike a confessed judgment so that the issues raised thereby can be determined in the event the judgment is opened.

Goodrich Amram 2d § 2959(b):2.

Thus, to the extent the trial court relied on any averments made after the judgment was opened, notably in answers to interrogatories, such conclusion was in error. Accordingly, we examine Bottger's petition to open and/or strike the confessed judgment, particularly those upon which the trial court relied, to determine whether these counterclaims were raised.

In its opinion, the trial court pointed to the following paragraphs of Bottger's petition.

> 72. WP Realty has breached that Early Lease Termination Agreement, wherein [Bottger] performed under its terms but WP Realty now refuses to end the lease term on February 28, 200[9], the day he returned possession of the Leased Premises to WP Realty.
>
> 73. At no time prior to Dr. Bottger securing his new office space and executing the Lease for New Office Space did WP Realty ever advise or notify him or otherwise indicate that it was not willing to honor the terms of the Early Lease Termination Agreement or that it intended to act contrary to its earlier request and promises.
>
> 74. Under the Early Lease Termination Agreement, the Lease ended when [Bottger] returned possession of the Leased Premises to WP Realty and [Bottger] has no further obligations of any kind under the Lease beyond that date.
>
> 75. It was WP Realty that breached the Early Lease Termination Agreement and it has improperly failed or refused to end the Lease as promised and has unreasonably, unfairly and improperly refused to honor its promises and agreement to end [Bottger's] obligations under the Lease upon him securing new office space and surrendering the Leased Premises to WP Realty.
>
> ***
>
> 96. WP Realty acted unreasonably and in breach of the Lease and Early Lease Termination Agreement.
>
> ***
>
> 98. The Lease terminated on February 28, 2009 as a matter of agreement between the parties pursuant to the Early Lease Termination Agreement and as a result, [Bottger] has no obligations to pay rent or other charges, fees or costs beyond that date.
>
> 99. [Bottger] did not breach the Lease but rather it was WP Realty which breached the Early Lease Termination Agreement

and has wrongfully and improperly failed or refused to honor and abide by its terms.

***

125.   WP Realty has acted wrongfully and unlawfully and with unclean hands and has otherwise intentionally breached its agreement with [Bottger], and thereafter, has taken improper, unlawful, illegal and wrongful steps to confess judgment against [Bottger] in an intentional and calculated manner to deprive him of his due process rights and cause him injury and harm.

Petition to Strike and/or Open Confessed Judgment, 5/6/2009.

A review of these paragraphs reveals that Bottger never used the word counterclaim, nor did he affirmatively request damages.  Our review of the entire petition reveals the same.  Therefore, we hold the trial court erred as a matter of law in awarding damages to Bottger and reverse WP 940's post-trial motion on that basis, vacate the judgment in part, and remand for the trial court to enter a judgment in favor of WP 940.  Having concluded that Bottger did not assert properly any claim for money damages, WP 940's remaining issues related to an award of reliance damages are moot, as those arguments stem from the trial court's erroneous determination that Bottger properly pled a claim for damages.

We now turn to WP 940's final issue: whether the trial court erred by not awarding any damages to WP 940 for Bottger's breach of contract. WP 940's Brief at 34-36.  Specifically, WP 940 requested, per the terms of the lease, rent due from the time Bottger vacated the property until the end of the lease term, as well as attorneys' fees.

The trial court declined to award damages to WP 940 because Bottger "presented at trial clear and convincing evidence that [WP 940], despite the terms of the Lease, induced Dr. Bottger through words and conduct in support of those words to change his financial condition to his substantial disadvantage through his justifiable reliance upon the words and conduct of the agents of [WP 940]." Trial Court Opinion, 7/14/2014, at 17. In other words, the trial court believed that WP 940's actions induced Bottger to believe that WP 940 had agreed to terminate his lease two years early; thus, it held that WP 940 could not collect rent from Bottger for those two years.

WP 940 argues that such a determination was improper because the lease at issue is governed by the statute of frauds;[2] therefore, any alleged modification had to be in writing. WP 940's Brief at 34. Moreover, WP 940 argues that the trial court erred in applying principles of estoppel,[3] as such

---

[2]

> The statute reads in pertinent part: "…[A]ny uncertain interest of, in, or out of any … lands, … made or created by … parol, and not put in writing, and signed by the parties so making or creating the same, or their agents, thereunto lawfully authorized by writing, shall have the force and effect of leases or estates at will only, and shall not, either in law or equity, be deemed or taken to have any other or greater force or effect, …."

*Charles v. Henry*, 334 A.2d 289, 291 n.1 (Pa. 1975) (quoting 33 P.S. § 1).

[3]

> As our Supreme Court has explained, equitable estoppel is a doctrine sounding in equity which acts to preclude one from doing an act differently than the manner in which another was induced by word or deed to expect. It arises when one by his acts, representations, or admissions, or by his silence when he

- 11 -

principles are inapplicable to contracts governed by the statute of frauds. **Id**. at 33.

We first point out that there are cases that support the contentions of both WP 940 and Bottger with respect to the relationship between principles of estoppel and the statute of frauds.  On one hand, there is a line of cases holding "that principles of estoppel may not be invoked against operation of the Statute of Frauds. **Polka v. May**,[118 A.2d 154 (Pa. 1955)]; **Peterson v. Chandler**, [] 66 A.2d 284 ([Pa.] 1949); **Mott v. Kaldes**, [] 135 A. 764 ([Pa.] 1927)."  **Borrello v. Lauletta**, 317 A.2d 254, 255 (Pa. 1974).

On the other hand, in **Davis v. Inv. Land Co.**, 146 A. 119 (Pa. 1929), our Supreme Court held that where an oral contract has been

> so far performed as to render it inequitable to permit a defendant to interpose the bar of the statute, he will not be allowed to do so. In **Hancock v. Melloy**, 187 Pa. 371, 379, 41

---

> ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.  When estoppel is established, the person inducing the belief in the existence of a certain state of facts is estopped to deny that the state of facts does in truth exist, aver a different or contrary state of facts as existing at the same time, or deny or repudiate his acts, conduct, or statements. There are two essential elements to estoppel; inducement and reliance. The inducement may be words or conduct and the acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced.

**Liberty Prop. Trust v. Day-Timers, Inc.**, 815 A.2d 1045, 1050 (Pa. Super. 2003) (internal quotations and citations omitted).

A. 313, 315, quoting with approval from **Riggles v. Erney**, 154 U. S. 244, 14 S. Ct. 1083, 38 L. Ed. 976, we said: "If the parol agreement be clearly and satisfactorily proved, and the plaintiff, relying upon such agreement and the promise of the defendant to perform his part, has done acts in part performance of such agreement to the knowledge of the defendant - acts which have so altered the relations of the parties as to prevent their restoration to their former condition - it would be a virtual fraud to allow the defendant to interpose the statute as a defence, and thus to secure to himself the benefit of what has been done in part performance."

*Id*. at 120.

Further, Pennsylvania law provides that the statute does not exist to help perpetrate a fraud:

Ever since that venerable statute was armed with authority to prevent the assertion of [oral] understandings regarding title to land, it has been called upon to strike down agreements which were not committed to writing. The laudable purpose of this guardian of truth is to prevent frauds and perjuries. Occasionally, however, an embattled property owner or prospective purchaser of land, summons the statute to enforce a condition which does not seem to coincide with principles of honesty and fair dealing. In such cases the Courts should study the situation involved to make certain that the statute is not being used to perpetrate fraud and perjuries rather than prevent them. In the same vein, Professor Corbin has said that the purpose of the statute of frauds is "the prevention of successful fraud by inducing the enforcement of contracts that were never in fact made. It is not to prevent the performance or the enforcement of oral contracts that have in fact been made; it is not to create a loophole of escape for dishonest repudiators." 2 Corbin on Contracts § 498, pp. 680-681 (1950).

**Fannin v. Cratty**, 481 A.2d 1056, 1064 (Pa. Super. 1984) (citation omitted) (quoting **Simplex Precast Industries, Inc. v. Biehl**, 149 A.2d 121 (Pa. 1959)).

Accordingly, we hold the trial court did not err in considering equitable principles to determine whether WP 940 did indeed induce Bottger to terminate his lease early. This case represents one of those circumstances where the trial court should "study the situation involved to make certain that the statute is not being used to perpetrate fraud and perjuries rather than prevent them." *Fannin*, 481 A.2d at 1064.

The trial court offered the following findings of fact in support of its conclusion that WP 940 entered into an oral modification of the contract, and induced Bottger to rely upon that oral agreement. Therefore, it concluded that WP 940 was not entitled to enforce the written lease.

> 7. In the summer of 2006, [Mr. Weingarten], the Chief Executive Officer of WP realty, Inc., and apparently of [WP 940], asked [Bottger] if he would relocate his medical practice early, before the end of his Lease, so that WP Realty, Inc. could take over the Leased Premises for its corporate use.
>
> ***
>
> 10. In mid-2006, [Bottger] agreed to relocate, and Mr. Weingarten and [WP 940] provided [Bottger] relocation assistance in the form of property leads for his medical practice.
>
> 11. Immediately after agreeing to [Mr.] Weingarten's proposal, [Bottger] began the search for a new medical practice location, both through his personal efforts and with the assistance of [WP 940].
>
> 12. Over the next two years, [WP 940,] through Mr. Weingarten and a manager, [Mr. Mortimer], assisted [Bottger] in his effort to relocate the plastic surgery practice.

Decision, 2/19/2014, at 2-3.

- 14 -

Based on these facts, the trial court concluded that Bottger "presented at trial clear and convincing evidence that [WP 940], despite the terms of the Lease, induced [Bottger] through words and conduct in support of those words to change his financial condition to his substantial disadvantage through his justifiable reliance upon the words and conduct of [WP 940's] agents." *Id*. at 8; *see also* Trial Court Opinion, 7/14/2014, at 17 (same).

To reach this conclusion, the trial court observed that "[d]uring the time period mid-2006 to June 2008, the trial testimony is replete with descriptions of occasions when representatives of [WP 940] referred [Bottger] to office space either controlled by [WP 940] or to space controlled by others having no legal connection with [WP 940]." Decision, 2/14/2014, at 5. Additionally, the trial court found the testimony of Weingarten,[4] "when weighed in comparison with that of Mr. Mortimer[5] and [Bottger to be]

---

[4] The trial court did not find the testimony of Mr. Weingarten credible. He testified that he merely suggested in 2006 that Dr. Bottger look at the other properties owned by WP 940 in the event that WP 940 chose not to extend the lease in Dr. Bottger's current space beyond 2011. N.T., 11/12/2013, at 60.

[5] The testimony of Mr. Mortimer, a property manager employed by WP 940 at the time of this dispute, demonstrates that between 2006 and 2008, WP 940 assisted Bottger in his search for new office space.

> [Counsel:] Okay. Now at some point did you -- were you asked by Mr. Weingarten to show Dr. Bottger some space in buildings that were owned by WP Realty?
>
> [Mortimer:] Yes.

[Counsel:] Okay. And do you know approximately when that was, sir?

[Mortimer:] I do not recall.

[Counsel:] Okay. And in fact, did you embark on that and actually show him some properties?

[Mortimer:] Yes.

[Counsel:] And do you recall offhand which properties, if any, that you did show him?

[Mortimer:] It was 944 Haverford Road and I believe 600 Haverford Road.

[Counsel:] Now at the time that you were showing him those properties did you have an understanding that Dr. Bottger was going to relocate his entire medical practice?

[Mortimer:] That was -- my understanding was he may relocate into one of our other properties.

[Counsel:] Were you present at any conversations between Dr. Bottger and Mr. Weingarten that led Dr. Bottger to start looking for space?

[Mortimer:] I was not.

\*\*\*

[Counsel:] It was your understanding that [Mr. Weingarten and Bottger] had some discussion that predated your involvement?

[Mortimer:] From Dr. Bottger. Yes.

[Counsel:] Okay. And it's true, though, that Mr. Weingarten eventually asked you to show Dr. Bottger at least two properties, as you've just testified?

[Mortimer:] That is correct.

inconsistent and not credible." ***Id*** (footnote added). The trial court also found Bottger's testimony to be "consistent, clear and credible." ***Id***.

---

\*\*\*

[Counsel:] And do you know whether you had suggested an architect by the name of Gary Begosian to [Bottger] to consult with?

[Mortimer:] I don't recall, but that's very possible. Gary did a lot of WP's work.

\*\*\*

[Counsel:] Okay. So you were having communications with Mr. Weingarten with regard to whether Dr. Bottger was interested in those properties. Is that fair?

[Mortimer:] I would say that's fair. Yes.

\*\*\*

[Counsel:] Did there come a time where Dr. Bottger discussed the possibility of his purchase of some vacant land in Newtown Square?

[Mortimer:] Yes.

[Counsel:] All right. And in regards to that did [Dr. Bottger] send you some paperwork, sir?

[Mortimer:] Yes.

[Counsel:] And were you kind enough to have some folks look at that and then respond back to him as to whether the price seemed to be right for the -- in the market and in that general area?

[Mortimer:] I was.

N.T., 11/13/2013, at 214-223.

- 17 -

These factual conclusions are supported by the record. Moreover, it is well-settled that in a non-jury trial, "the trial court functions as fact-finder, and the appellate courts generally do not substitute their judgments for those of a fact-finder in matters of credibility." **Commonwealth v. Sanchez**, 907 A.2d 477, 491 (Pa. 2006).

Based on the trial court's credibility determinations and the support in the record, we conclude the trial court did not err in concluding that principles of equity support the trial court's decision not to award damages to WP 940. Accordingly, we affirm that portion of the judgment.

Order denying WP 940's motion for post-trial relief reversed in part. Judgment vacated. Case remanded to the trial court for judgment to be entered consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/5/2015