**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**Michael KANE, Appellee.**

**Commonwealth of Pennsylvania,**
**Appellant**

v.

**Richard Ruh, Appellee.**

**Commonwealth of Pennsylvania,**
**Appellant**

v.

**Paul Spreng, Appellee.**

Superior Court of Pennsylvania.

Submitted July 30, 2007.
Filed Dec. 31, 2007.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellant.

Kenneth A. Young, Philadelphia, for Kane.

Dennis I. Turner, Philadelphia, for Ruh.

Stephen P. Patrizio, Philadelphia, for Spreng.

BEFORE: LALLY–GREEN, BOWES and POPOVICH, JJ.

OPINION BY BOWES, J.:

¶ 1 The Commonwealth has filed these three appeals from an April 26, 2006 order suppressing evidence seized following execution of two search warrants.[1] We have elected to dispose of the three appeals in a single adjudication because the same search was involved at all three case numbers. We hereby reverse.

¶ 2 Initially, we observe that when the Commonwealth appeals from an order granting a motion to suppress:

[W]e consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. *See Commonwealth v. Gaul,* 867 A.2d 557, 559 (Pa.Super.2005). We must "first ascertain whether the record supports the factual findings of the suppression court, and then determine the reasonableness of the inferences and legal conclusions drawn therefrom." *Commonwealth v.*

*Rosa,* 734 A.2d 412, 414 (Pa.Super.1999) (citation omitted), *appeal denied,* 561 Pa. 693, 751 A.2d 189 (2000). The suppression court's factual findings are binding on us and we may reverse only if the legal conclusions drawn therefrom are erroneous. *See Commonwealth v. Williams,* 749 A.2d 957, 960 (Pa.Super.2000), *appeal denied,* 564 Pa. 710, 764 A.2d 1069 (2001).

*Commonwealth v. Rosas,* 875 A.2d 341, 346 (Pa.Super.2005).

¶ 3 The Commonwealth brought charges against Michael Kane, Richard Ruh, and Paul Spreng (collectively "Appellees") after police discovered a massive marijuana growing operation at 2845 and 2847 C Street, Philadelphia. Stephen Morrison was also involved in the drug-related activities, but he is not involved in these appeals. The 2845 and 2847 C Street addresses pertained to the same building in Philadelphia. The building had discrete numerical designations because it contained both a warehouse and a residence. Although separately numbered, the warehouse and residence were accessible to each other internally. Police initiated an investigation into the operation conducted from that building after receiving information from a confidential informant.

¶ 4 The facts, culled from the record in accordance with our standard of review, regarding the search of the single building known as 2845 and 2847 C Street will now be summarized. On May 10, 2004, police secured two search warrants, one for 2845 C Street, which was the residence, and another for 2847 C Street, which was the warehouse containing the growing plants. The warrants outlined the following recitation of probable cause. On April 1, 2004, Philadelphia Police Officer Peter

1. The Commonwealth certified in its notices of appeal and its briefs that the order suppressing physical evidence substantially handicaps its prosecution of these cases. Hence, this appeal is properly before us. Pa.R.A.P. 311(d).

Sarris, who is a member of the Narcotics Intelligence and Investigative Unit of the Philadelphia Police Department, received information from a reliable confidential informant ("CI") that a man whom the informant knew as Mike Levinson was in charge of an enterprise that grew large quantities of high-quality marijuana at a warehouse in West Philadelphia. The CI said Levinson did not own the facility but that he operated it on behalf of individuals who were unknown to the CI. The CI also stated he had observed a large amount of marijuana growing in the basement of Levinson's home, which was located at 538 Tyson Avenue, Philadelphia.

¶ 5 Officer Sarris ascertained that the individual residing at 538 Tyson Avenue was actually named Michael Kane, one of the Appellees herein, rather than Michael Levinson. The CI later confirmed that Kane was the individual whom he knew to be in charge of the marijuana-growing operation at 2847 C Street. On April 5, 2004, police conducted surveillance at Kane's home. At approximately 9:45 a.m., Kane left his residence and was followed by police to a store, where Kane purchased items utilized by people who grow plants.

¶ 6 Surveillance continued on April 13, 2004. That day, Kane went to the aforementioned warehouse located at 2847 C Street and opened the outer warehouse gate automatically with a remote control device. As they peered into the warehouse facility through the open door, police observed a parking area for two to three vehicles, a parked white Plymouth Voyager, and another gate blocking entry into the warehouse itself. When the Voyager later left the premises, police obtained its license plate number and as a result of their investigation, discovered that the driver of the Voyager was Appellee Spreng and that Spreng, together with Nancy Hoffner, owned the building with

the address 2845 and 2847 C Street. Spreng resided at 413 South 43rd Street, Philadelphia.

¶ 7 On May 3, 2004, two officers surveilled the building at 2847 C Street. Spreng was observed exiting the warehouse, and soon after, Stephen Morrison followed Spreng to Spreng's home in a Subaru Legacy. Approximately one hour after Spreng had vacated the warehouse, Appellee Ruh was seen leaving the same facility with a large bag. Ruh entered 2845 C Street. Officer Sarris knew Ruh because Ruh had been arrested in connection with another indoor marijuana-growing operation. Officer Sarris was involved in that investigation, which led to the seizure of a vast quantity of bulk marijuana and indoor plant growing equipment.

¶ 8 On the following day, May 4, 2004, police again observed 2847 C Street. At approximately 9:20 a.m., Ruh exited 2845 C Street and entered the warehouse at 2847 C Street using a remote door opener. Morrison arrived ten minutes later and Spreng appeared forty minutes after Morrison. Spreng almost immediately left again and was followed to Garden Indoors, a large retail store that sold indoor growing and hydroponics equipment and supplies. Spreng was overheard by police asking about a device that neutralizes odor for an indoor room with a size of up to 10,000 square feet and was videotaped purchasing two large containers of liquid fertilizer and boxes containing high-intensity grow lamps. Spreng delivered those goods to the warehouse.

¶ 9 On May 5, 2004, police removed trash from the curb of Spreng's 413 South 43rd Street residence and recovered a letter addressed to Spreng at 413 South 43rd Street and a letter addressed to Ruh at 413 South 43rd Street. Police also ascertained that Spreng had a prior arrest for possession with intent to deliver a con-

trolled substance and that the electricity used at 2847 C Street was ten times the electricity usage at other comparable properties in the immediate area. Officer Sarris indicated that this extremely high wattage usage was consistent with the electricity consumption of high-intensity lamps used by marijuana growers.

¶ 10 We now review the facts regarding execution of the warrants that were adduced at the suppression hearings conducted in these matters. The warrants were executed at approximately 6:00 a.m. on May 11, 2004. Philadelphia Police Lieutenant Stephen Bennis, a member of the SWAT unit, testified that he was senior officer of the operation and was responsible for compliance with the knock and announce rule. Numerous officers were assisting him. Lieutenant Bennis elected to execute the warrant for 2845 C Street, the residence, first because it "was easier to get into that property" as an "occupied structure, and if we had knocked and announced, it's a good possibility someone would have answered the door." N.T. Suppression Hearing, 4/24/06, at 19.

¶ 11 Lieutenant Bennis was aware that the portion of the building that consisted of the warehouse was contiguous with the residence and located in the same building. He proceeded to execute the 2845 C Street warrant as follows, "I knocked and announced three times. By knocking and announcing, I banged on the front door with my right fist and in a loud voice yelled, 'Police with a warrant.'" *Id.* at 23. No one responded, but Lieutenant Bennis perceived movement within the residence through glass that was in the door. He waited ten to fifteen seconds between the first and second knock-and-announce and then another twenty to thirty seconds between the second and third knock-and-announce. *Id.* at 25. There were five dogs on the premises, and they started to

bark after the first knock and announce. *Id.* at 157.

¶ 12 Ten to fifteen seconds after the third warning, police forcibly entered through the front door by battering it down. Police first encountered Ruh, who shouted, "Don't shoot my dogs." N.T. Suppression Hearing, 4/26/06, at 8. Lieutenant Bennis allowed Ruh to lock his dogs in a room on the second floor. Ruh returned to the first floor and was secured with his stepson, Mark Rowbotham, who was the only other occupant of the residence. As Ruh and Mr. Rowbotham were being processed, Lieutenant Bennis proceeded to the basement, where there was marijuana drying on a clothesline. Next, he went to the second floor to ensure that the dogs were safe and no one else was in the apartment, and he then returned to the first floor. Upon his return, he viewed an open inner doorway leading from the apartment into the warehouse. Lieutenant Bennis delineated that when he returned to the first floor from the second floor, two police officers "were standing outside of the door that led into the warehouse. They were prepared. They were ready to go in through the door. They were just waiting on my arrival." N.T. Suppression Hearing, 4/24/06, at 33.

¶ 13 Lieutenant Bennis and his two fellow officers were the first to proceed into the warehouse, and they announced that they were police officers executing a warrant before crossing the threshold. Lieutenant Bennis explained that as he proceeded into each room during the execution process, he loudly yelled, "Police with a warrant," because it was "just our procedure. Anytime you cross a threshold of a doorway, you announce, 'Police with a warrant.'" *Id.* at 35. When police searched the warehouse, they discovered a huge marijuana-growing operation.

¶ 14 It was not contested that the inner entrance connecting the apartment to the warehouse was covered by a tapestry located behind a sofa on the first floor of Ruh's residence. There also was no dispute that the entrance consisted first of a wooden door that was not on its hinges, then a layer of insulation, and finally a metal door that was locked and that opened into the warehouse.

¶ 15 Since Lieutenant Bennis was not present when the inner entrance to the warehouse was discovered and opened, two SWAT officers who aided in the execution of the warrants were called as witnesses as to those events. They stated that the tapestry, wooden door, and insulation were removed and that they knocked and announced on the metal door. When they did not receive an answer, they planned to remove the metal door by force when Ruh offered them a key, which they used to open the door.

¶ 16 However, those officers had violated a sequestration order entered by the suppression court, so the court elected to disbelieve that evidence and instead, credited the evidence of Mr. Rowbotham, who testified for the defense, about the manner of entry into the warehouse. Mr. Rowbotham informed the suppression court that police first moved the couch, then removed the tapestry, the wooden door, and the insulation behind the wooden door, and finally, proceeded to force open the metal door. He stated that they did not knock and announce their purpose prior to breaking down the metal door. N.T. Suppression Hearing, 4/26/06, at 10.

¶ 17 In its findings of fact and conclusions of law, the suppression court specifically found that police complied with the knock and announce rule [2] when they entered the apartment. Id. at 76–77. It also believed Lieutenant Bennis, who had not violated the sequestration order, that before he entered the warehouse with the other two police officers, "all three made the announcement 'Police Officers.'" Id. at 141. Nevertheless, it had credited Mr. Rowbotham's testimony that police removed the wooden and metal doors without first knocking and announcing their purpose, and the suppression court concluded that a violation of the knock and announce rule had occurred. Even though that court had specifically accepted Lieutenant Bennis's testimony that an announcement was made prior to actual entry into the warehouse, it opined that this announcement was insufficient because "the door was already opened. So [the fact that police announced their purpose before entering the warehouse] has no meaning for these purposes." Id. at 142. Based on its conclusion that the knock and announce rule was violated because police did not knock and announce on the metal door prior to its removal, the court suppressed all the evidence seized from the warehouse. This Commonwealth appeal followed.

■ ¶ 18 Initially, we must stress that due to the factual determinations of the

2. Pa.R.Crim.P. 207 embodies the knock and announce rule:

(A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require the officer's immediate forcible entry.

(B) Such officer shall await a response for a reasonable period of time after this announcement of identity, authority, and purpose, unless exigent circumstances require the officer's immediate forcible entry.

(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.

suppression court, which are supported by the record, the Commonwealth concedes that police violated the knock and announce rule on the inner doors leading to the warehouse by failing to knock and announce before removing the metal door. The Commonwealth first maintains that police were not required to knock and announce at the inner doors to the warehouse as that entry was made pursuant to a protective sweep. Alternatively, the Commonwealth suggests that even if police were required to comply with the rule at the inner doorway, the suppression order "was clearly unjustified" because the "police substantially complied with the knock and announce rule with respect" to the second door by repeatedly screaming "police" and "warrant" before entry into each room of the residence and then the warehouse. Commonwealth's brief at 10.[3] In connection with this latter argument, the Commonwealth notes that the knock and announce rule had been satisfied at 2845 C Street, Ruh had not complied with the police directive to open and allow them entry, and that while police did not knock and announce before removing the inner door to the warehouse, they did announce their identity and purpose before they physically crossed the threshold into that portion of the building. *Id.* The Commonwealth suggests that its substantial compliance with the knock and announce rule renders suppression improper. We agree with the Commonwealth's second argument. We first examine the purpose for the rule itself:

Pennsylvania Rule of Criminal Procedure 207 requires that law enforcement

officers give, or make a reasonable effort to give, notice of their identity, authority, and purpose to the occupant of the premises, unless exigent circumstances require immediate forcible entry. *See* Pa.R.Crim.P. 207. The rule is designed to promote peaceable entry by affording fair warning, and to safeguard legitimate privacy expectations to the degree possible. *See Commonwealth v. Morgan,* 517 Pa. 93, 97, 534 A.2d 1054, 1056 (1987). The procedural rule subsumes the Fourth Amendment requirement that officers must announce their presence upon the execution of a search warrant and provide residents with some chance to open the door. *See Hudson v. Michigan,* 547 U.S. 586, ——, 126 S.Ct. 2159, 2162–63, 165 L.Ed.2d 56 (2006) (quoting *Richards v. Wisconsin,* 520 U.S. 385, 394, 117 S.Ct. 1416, 1422, 137 L.Ed.2d 615 (1997)).

*Commonwealth v. Sanchez,* 589 Pa. 43, 63, 907 A.2d 477, 489 (2006).

¶ 19 There are exceptions to the knock-and-announce requirement "for situations presenting risks of physical violence ... and where announcement would be futile." *Id.* In order to invoke an exception, police must only possess "a reasonable suspicion that one of these grounds is present." *Id.*

¶ 20 The circumstances under which the police do not have to knock and announce their purpose have been more fully delineated as follows:

Exceptions to the rule have developed on the basis of the reasonableness of the

**3.** While Appellees suggest that this argument was not made to the suppression court and is waived for purposes of this appeal, our review of the record reveals that this suggestion cannot be sustained. The district attorney articulated "multiple theories" in support of his position that suppression was not mandated by the knock and announce rule. N.T. Sup-

pression Hearing, 4/26/06, at 96. One "key" theory advanced by the Commonwealth was that a knock and announce prior to removal of the metal door leading to the warehouse was unnecessary because the police were "virtually certain that the occupants of the premises already [knew] of their purpose." *Id.* at 82.

police officers' conduct in particular cases, and include the following: (1) the police need not engage in the futile gesture of announcing purpose when the occupants of the premises remain silent after repeated knocking and identification, (2) the police are virtually certain that the occupants of the premises already know their purpose; (3) the police have reason to believe that an announcement prior to entry would imperil their safety; and (4) the police have reason to believe that evidence is about to be destroyed. These exceptions to the "knock and announce" rule fulfill the purpose of the rule in that entry is accomplished with a minimum of danger to officers and occupants or damage to the premises.

*Commonwealth v. Morgan,* 517 Pa. 93, 97, 534 A.2d 1054, 1056–57 (1987) (citations omitted).

¶ 21 The Commonwealth first suggests that police did not have to comply at all with the knock and announce rule with respect to entry from the residence into the warehouse. It maintains that they were permitted to enter the warehouse without complying with the rule as part of a protective sweep because they were entering the warehouse from a hidden inner door, one of the defendants in these actions was known to have access to a large cache of firearms, and police feared for their safety. This argument would be entitled to consideration if it had been advanced at some level during the suppression hearing with factual support. However, we have reviewed the testimony adduced at that hearing, and there simply is no evidence to that effect in the record. In this case, the Commonwealth presented no testimony that police had reason to believe that there may have been an armed person in the warehouse.

¶ 22 As noted, the Commonwealth's evidence regarding the breach of the inner door revolved around its position that police had knocked and announced before opening the metal door and that when they started to forcibly remove it, Ruh gave them a key. *See* N.T. Suppression Hearing, 4/24/06, at 122–26, 135–36; N.T. Suppression Hearing, 4/25/06, at 28. However, it came to light that the police officers who testified about those events had violated the suppression court's sequestration order, so that testimony was specifically discredited by the suppression court.[4] Thus, no police officer actually indicated that he had concern for his personal safety while entering the warehouse due to Appellees' access to weapons.

¶ 23 Nevertheless, we do agree with the Commonwealth's second position, which is

---

4. Appellee Ruh vaguely implies that we should affirm herein because suppression was partially based on the fact that the Commonwealth violated the suppression court's sequestration order. We cannot agree with this characterization of the record. At the suppression hearing, Appellees asked specifically that the evidence be suppressed solely because some police officers violated the sequestration order. The suppression court rejected that position, concluding that there was no legal authority for it. N.T. Suppression Hearing, 4/25/06, at 61–62. Instead, as a sanction, the suppression court discredited the Commonwealth's evidence regarding the **manner of entry into the warehouse,** which was the subject discussed by the police officers in violation of the order, and decided to credit Mr. Rowbotham's testimony that police removed the metal door without knocking and announcing. Trial Court Opinion, 1/17/07, at 3.

It is within the suppression court's discretion to select the appropriate remedy for the violation of its sequestration order. *Commonwealth v. Smith,* 464 Pa. 314, 346 A.2d 757 (1975). As noted above, Mr. Rowbotham testified that police removed the doors leading from the apartment to the warehouse without knocking and announcing their purpose. We have, as we are required to do under our standard of review, accepted that testimony as true for purposes of our review.

that there was substantial compliance with the knock and announce rule and that a knock at the metal door prior to its removal would not have served any meaningful purpose because under the circumstances, anyone located in the warehouse would have been fully aware of police presence and purpose and would have had ample opportunity to peacefully surrender.

¶ 24 We begin our analysis by noting that our Supreme Court has stated that whether suppression should be granted as a remedy for a violation of the knock and announce rule depends on whether the terms of the Fourth Amendment are implicated. *Commonwealth v. McDonnell,* 512 Pa. 172, 516 A.2d 329 (1986). In *McDonnell,* police failed to knock and announce on an unlocked porch door, entered onto the unoccupied porch, and then complied with the rule at the front door to the house. Our Supreme Court reversed our decision to uphold suppression, which was based upon a perceived violation of the knock and announce rule at the porch door. The Court outlined the history of the doctrine:

> The "knock and announce" rule's origins pre-date the United States Constitution. It was born in English Common Law and was subsequently adopted in America. In recent times, the "knock and announce" rule has assumed a Constitutional dimension. Both our Court and United States Supreme Court have held that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to the manner of a warrant's execution. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Commonwealth v. Newman,* 429 Pa. 441, 240 A.2d 795 (1968). Even a valid warrant may not be executed in an unreasonable manner; unreasonableness is determined on a case-by-case basis. *Id.*

*Id.* at 176–77, 516 A.2d at 330–31.

¶ 25 The *McDonnell* Court held that in order to assess whether suppression is appropriate based on a knock and announce violation, police conduct must be examined in light of the Fourth Amendment, which mandates that police be reasonable. The Court concluded that the police in that case had not acted unreasonably or in bad faith because they did not believe the occupants of the house would be able to hear a knock on the porch door, and they complied with the rule at the front door. The Court held:

> Since [the Commonwealth] did not engage in an unreasonable search or seizure the Fourth Amendment was not violated. In the absence of a constitutional violation we have held that suppression of evidence is not automatically required when rules of procedure have been violated. Thus, suppression of evidence is not required for the minimal intrusion which took place here regardless of whether the rule was violated.

*Id.* at 178, 516 A.2d at 331 (citation omitted).

¶ 26 More recently, our Supreme Court refused to grant suppression based on a violation of the knock and announce rule with respect to execution of a search warrant at a boarding house. *Sanchez, supra.* Therein, police had not knocked prior to entry into the defendant's room. However, they had repeatedly announced that they were police with a warrant as they approached the partially-opened door to that room. The Commonwealth acknowledged the violation presented by the fact that police did not knock on the door, but it invoked the safety and futility exceptions to the rule. Our Supreme Court accepted the Commonwealth's position, noting police had attempted to comply

with the rule by yelling their presence and purpose and that there were exigent circumstances presented by the fact that police had reason to believe that the defendant may have been armed. *See also Commonwealth v. Piner*, 767 A.2d 1057, 1059–60 (Pa.Super.2000) (knock and announce rule satisfied sufficiently even though police announced but did not knock where uniformed officer stood under porch light and occupants of house did not respond after viewing officer through transparent, screened front door; a "knock in such a case would have been a superfluous act, as the occupants were already alerted" to the police).

¶ 27 Case law thus establishes that where the purpose of the rule has not been offended and where police conduct is reasonable, suppression will not be granted based upon an overly-technical approach to the knock and announce rule. In the present case, we conclude that suppression is simply unwarranted. The following factors are key to our decision. Lieutenant Bennis deliberately proceeded to the residence first in order to comply with the knock and announce rule because he believed that 2845 C Street would be occupied and that utilization of the knock and announce rule would lead to peaceful relinquishment of the premises. The knock and announce rule was fully complied with at the residence and its occupants, Mr. Ruh and Mr. Rowbotham, had refused to surrender peacefully. At the first knock and announce, Ruh's five dogs started to bark so loudly that police outside the apartment could hear them. Police forced open the door to the apartment by battering it down. Police secured the entire, three-level apartment before entering the warehouse. As police entered each room of the apartment, they shouted that they were police in possession of a warrant. Even though no officer knocked and announced before removing the metal door leading from the apartment to the warehouse, Lieutenant Bennis did yell his identity and purpose prior to crossing that threshold.

¶ 28 "The [knock and announce] rule is designed to promote peaceable entry by affording fair warning, and to safeguard legitimate privacy expectations to the degree possible." *Sanchez, supra* at 63, 907 A.2d at 489. If anyone had been located in the warehouse, it was virtually certain they would have been fully alerted to the police presence and purpose and would have had ample opportunity to peacefully surrender by the time police crossed the threshold into the warehouse. This knowledge of police purpose and presence would have been gleaned from the police shouts outside the apartment, the sound of the apartment door being battered down, the barking dogs, the police yelling their presence and purpose throughout the three tiers of the apartment, and the fact that police yelled their identity and purpose before crossing the inner threshold into the warehouse. Furthermore, the police conduct in this case simply was not unreasonable nor did it offend constitutional mandates. Hence, suppression was not justified in this case.

¶ 29 Order reversed. Case remanded. Jurisdiction relinquished.