J-S08013-21

2021 PA Super 98

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ARTHUR LEE BELLAMY | |
| Appellant | No. 281 MDA 2020 |

Appeal from the Judgment of Sentence Entered March 27, 2018
In the Court of Common Pleas of Lackawanna County
Criminal Division at No.: CP-35-CR-0001336-2016

BEFORE:  STABILE, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY STABILE, J.:                                    FILED MAY 14, 2021

Appellant Arthur Lee Bellamy appeals the March 27, 2018 judgment of sentence entered in the Court of Common Pleas of Lackawanna County ("trial court"), following the *nunc pro tunc* reinstatement of his direct appeal rights. Upon review, we affirm.

On April 6, 2016, Dunmore Borough Police Department charged Appellant with possession with intent to deliver ("PWID") (heroin), conspiracy to commit PWID, possession of a controlled substance (heroin), and possession of drug paraphernalia.[1]  The affidavit of probable cause accompanying the complaint alleged:

On April 5, 2016 at approximately 2110 hours, members of the Dunmore Police Department, Lackawanna County District

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), 18 Pa.C.S.A. § 903(a)(1), and 35 P.S. § 780-113(a)(16), and (32), respectively.

Attorney's Office Detectives and members of the Lackawanna County Drug Task Force executed a search warrant, approved by Deputy District Attorney Michael Ossont and out of the office of the District Judge Paul Ware, at the Econo Lodge 1175 Kane Street Scranton PA (Room # 229). As Drug Task Force members prepared to make entry to room # 229, they encountered a white male (later identified as John Bell) opening the door to the room. Detectives then made entry into the room and encountered [Appellant] and Avette [McNeil[2]] near the bed area. All suspects were taken into custody and made aware of their rights, which they verbally stated they understood.

Detectives then began a search of the room (# 229), where . . . Detective Corey Condrad recovered a plastic zip-lock bag containing 10 glassine bags of suspected heroin and $2,519.00 of US currency located in the dresser drawer near the beds. [Detective Condrad] then recovered a men's black Nike sneaker on the floor near the bed. Inside the sneaker, [he] recovered a plastic zip-lock bag containing 400 glassine bags of suspected heroin. Officer Golden (SPD) recovered a womens [(sic)] purse on top of the bed. Inside the purse Officer Golden recovered 1 glassine bag of heroin and a plastic bag containing rubber bands. [Detective Condrad] then recovered a Samsung cellular phone and two LG cellular phones, along with $21.00 of US currency on top of the bed. [Appellant] stated that the Samsung phone belonged to him. All items were photographed at their location. All suspects were then transported to the Dunmore Police Headquarters.

At Dunmore Police Headquarters, Detective [Harold] Zech recovered 5 bags of suspected heroin from inside Bell's under ware [(sic)], during a further search incident to arrest. [Detective Condrad] field tested the heroin with positive results. The Samsung cellular phone was identified as the "target["] cellular phone used by [Appellant] in this investigation. Also, a sum of US currency was identified as pre-recorded, serialized US currency also used during this investigation. [Appellant], Bell, and [McNeil] were then transported to the Lackawanna County Processing Center on drug charges.

_____

[2] Avette's last name is spelled various different ways in the certified record. For instance, she is referred to as "Maneil" and "McNeal." We, however, will refer to her as McNeil herein.

> All items seized in the investigation were entered and secured into evidence and the heroin will be sent to PSP Wyoming Crime Lab for further testing.

Affidavit of Probable Cause, 4/6/16 (sic). The charges were held for court. On October 21, 2016, Appellant filed an "Omnibus Pretrial Motion," seeking to suppress communication intercepted through the Wiretapping and Electronic Surveillance Control Act (the "Wiretap Act"), 18 Pa.C.S.A. §§ 5701-5782. Additionally, he sought to suppress evidence recovered in the room at the Econo Lodge because of the police officers' alleged failure to comply with Pa.R.Crim.P. 207, which codifies the knock and announce rule.[3]

The trial court conducted a hearing on the pretrial motion, which spanned two days. At the hearing, the Commonwealth presented the testimony of three police officers. First, the Commonwealth called to the stand Detective Condrad. N.T. Suppression, ,4/10/17, at 3. He testified that he had been employed by the Dunmore Police Department for approximately two years. *Id.* Describing his duties, Detective Condrad testified:

> I'm assigned to the drug unit there. Some of my duties are meeting with confidential informants, interviewing those informants, finding out who is selling narcotics. Once we find out, we arrange controlled purchases either in an undercover capacity or have informants go and purchase those narcotics. We also execute search warrants prior to those operations.

---

[3] Appellant did not identify the officers' alleged violation of Rule 207 as a separate basis for seeking suppression. We, however, overlook this omission, because the facts contained in his omnibus pretrial motion sufficiently subsumed this issue, and Appellant subsequently discussed it with specificity in his brief in support of the pretrial motion.

*Id.* at 3-4. Detective Condrad testified that he has been involved in over 500 drug investigations. *Id.* at 4. He further testified that at 7:00 p.m., on April 5, 2016, he, along with Detectives John Munley and Zech, met with a confidential informant ("CI") about heroin sales in the City of Scranton.[4] *Id.* at 4, 19. The CI informed them that

> he or she could purchase heroin from a black male known to the informant by the street alias Bo. The informant gave a description of Bo as a black male, heavyset, approximately 6'2, in his 30s. Detectives were familiar with an Arthur Bellamy [(Appellant)] from prior investigations who goes by the street alias Bo. The informant later stated that Bo was selling heroin out of Room 229 at the Econo Lodge. I then obtained a JNET photograph of Bellamy. I provided that photograph to the informant. The informant then positively identified Bellamy as Bo, the person selling heron from [Room] 229.

*Id.* at 4-5. According to Detective Condrad, the CI provided them with a cellular phone number for purposes of contacting [Appellant]. *Id.* at 5. Detective Condrad testified that he relayed the information to Deputy District Attorney Ossont, who consensualized the CI. *Id.* "After the consensualization was over, the [CI] placed an intercepted and recorded phone call to [Appellant]. During the phone call, [Appellant] agreed to meet with the [CI] at Room 229 to sell him or her a quantity of heroin." *Id.* Detective Condrad recalled that after the phone call, the CI and his or her vehicle were "thoroughly searched for currency and contraband." *Id.* at 6. Detective

---

[4] Detective Condrad testified that Detectives Zech and Munley had worked previously with the CI. N.T. Suppression, 4/10/17, at 31.

- 4 -

Condrad testified that he provided the CI with $100.00 of pre-recorded and serialized US currency to effectuate the heroin purchase from Appellant. *Id.*

He further testified that, thereafter, he and Detective Zech established surveillance near Room 229 at the Econo Lodge. *Id.* "I then kept the [CI] under surveillance as he or she travelled from the District Attorney's Office to the Econo Lodge." *Id.* Detective Condrad recalled that "Detective Zech then kept the [CI] under surveillance as he or she entered the room of 229. Within a few minutes that [CI] was observed exiting that room where he or she then met with me and handed me ten glassine bags of suspected heroin," which field tested positive. *Id.* at 6-7. According to Detective Condrad, the CI did not meet anyone else on his or her way to or from Room 229. *Id.* at 7.

Detective Condrad recalled that, after the contraband that the CI purchased from Appellant field tested positive for heroin, Detective Munley prepared and applied for a search warrant for Room 229, which was signed by Magistrate Paul Ware and approved by Deputy District Attorney Ossont. *Id.* Detective Condrad testified that they executed the search warrant on the same day (April 5, 2016) at 9:10 p.m. *Id.* Describing the events leading up to the search, Detective Condrad recalled:

> We observed a white male exit [Room 229]. That male was later identified as John Bell. Mr. Bell was detained. He was given his ***Miranda***[5] warnings which he verbally stated he understood. We then made entry into that room where we encountered [Appellant] and [Ms. McNeil] inside the room near the bed.

---

[5] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

*Id.* at 7-8. Detective Condrad clarified that, as they were approaching and the door opened, they "could see there was [(sic)] additional occupants beside Mr. Bell inside the room." *Id.* at 8. He testified that the occupants inside were able to see him and he was wearing a tactical police vest, *i.e.*, a "bullet proof vest that says Police on the front of it." *Id.*

Detective Condrad further testified that when they entered the room, the police officers said "search warrant." *Id.* They, however, did not knock on the door, because it opened. *Id.* Detective Condrad stated that "[o]nce [Appellant] and Mr. Bell observed us, we were in fear that they might destroy evidence or for officer safety that they might have a weapon, therefore, we entered the room without knocking." *Id.* at 8-9. The occupants, Appellant and Ms. McNeil, were detained. *Id.* at 9. Thereafter, according to Detective Condrad, Appellant and Ms. McNeil were *Mirandized* and the room was searched pursuant to the search warrant. *Id.* The police recovered narcotics, which later tested positive for heroin, U.S. currency, including the $100 in pre-recorded and serialized U.S. currency provided to the CI, and three cell phones. *Id.* at 9-10. Detective Condrad testified that Appellant claimed ownership of the Samsung cell phone. *Id.* at 9.

On cross-examination, Detective Condrad confirmed that he had known Mr. Bell prior to encountering him during the execution of the search warrant in this case. *Id.* at 12. Detective Condrad clarified that when Mr. Bell exited Room 229, he did not close the door and that the door was open. *Id.* He explained that Mr. Bell was detained and *Mirandized* in the "doorway portion"

of the room. *Id.* at 13. Detective Condrad stated that Mr. Bell "was brought out of the room and then to make way for the detectives to enter the room." *Id.* According to Detective Condrad, Appellant and Ms. McNeil observed the police taking Mr. Bell and putting him in handcuffs. *Id.* When asked how much was the door open, Detective Condrad replied "[e]nough for me to see into the room." *Id.* Detective Condrad explained:

> This was all happening very quickly, if you can imagine, somebody coming out of the room. We were – we were ready to make entry into that room using a ramming device. Once that door opened, Mr. Bell walked out. He was immediately handcuffed, taken out of the way, given his *Miranda* warnings at the time we entered the room.

*Id.* at 13-14.

The Commonwealth next presented the testimony of Detective John Munley. N.T. Suppression, 7/24/17, at 4. Detective Munley agreed with Detective Condrad's account of what transpired at the Econo Lodge on April 5, 2016. *Id.* at 7. Detective Munley recalled that "[a]s [Mr. Bell] was exiting the room, we were entering. It was happening simultaneously. We were approaching the room as he exited." *Id.* Explaining the reason for the officers' failure to knock, Detective Munley stated:

> Well, here's what happened. Again, we were about to go up, knock on the door, announce, but as we were approaching [Mr. Bell] exited. He saw us. We were right next to the door, so the occupants in the room also saw us. We yelled, "Police. Get on the ground." And we took them into custody along with Mr. Bell.

*Id.* at 7-8. Detective Munley recalled that Mr. Bell was not taken into custody and ***Mirandized*** prior to their entry into Room 229, because "[w]e wouldn't have had time for that." *Id.* at 8. He explained that "[i]t happened so fast. He's coming out of the room. He's grabbed, taken into custody as others enter." *Id.* Detective Munley testified that he did not have any information indicating the presence of weapons in the room prior to entering it. *Id.* When asked whether he had any "specific facts to indicate" that Appellant was about to destroy narcotics, Detective Munley replied:

> As far as the weapons and destruction of evidence, the only thing I have is my training, knowledge, education, and experience in over a thousand drug investigations where it's common for drug dealers to both carry weapons and destroy evidence if they have a chance.
>
> . . . .
>
> No, we were in so fast [Appellant] didn't have a chance. The door was open.

*Id.* at 8-9. According to Detective Munley, Appellant did not have a chance to make any furtive movements. *Id.*

Lastly, the Commonwealth called to the stand Detective Harold Zech. *Id.* at 11. Recalling the circumstances surrounding the execution of the search warrant, Detective Zech testified:

> Our entry team arrived at the hotel, the Econo Lodge, exited our vehicles, formed a stack, which is basically a line of officers, given a specific duty. I had a ram with me in case we had to force entry into the hotel room. We proceeded to the second floor of the hotel, approached the door. And as we approached, we had a person exiting the room. I believe his name was Bell. He was detained, forced to the last person in the stack. And being that

the door was open, we could clearly see persons inside. We announced our presence and entered the room. We were compromised at that point.

*Id.* at 12-13. Upon entering Room 229, according to Detective Zech, they detained Appellant and Ms. McNeil. *Id.* at 13. Detective Zech recalled that, because he was one of the first officers approaching the door, he personally announced their presence. *Id.* When asked whether he indicated to any occupants his purpose for being there, Detective Zech replied that "[i]t was pretty obvious after they were placed in handcuffs and they were notified that this was a search warrant." *Id.* at 13. He testified that he did not observe any attempts by the occupants of Room 229 to destroy evidence. *Id.* at 14.

In response, Appellant testified on his own behalf. *Id.* at 15. Describing what happened that night, he stated:

> As Mr. Bell was leaving, he was opening the door. And when he was opening the door, the officers was [(sic)] waiting outside the door. When they seen he was opening the door they busted in the door. They yelled, "Police", and they ran straight to me. They took Mr. Bell. They ran straight to me, took me down, and put me in cuffs. And they did the same thing with Ms. McNeil.

*Id.* at 16. Appellant testified that the police did not give him any type of opportunity to surrender peacefully. *Id.* He further testified that the police did not knock and announce their presence. *Id.*

Q. How much was the door opened?

A. Mr. Bell was – he was opening the door. The door wasn't open. He was opening the door to leave and they was out there.

Q. And then what happened as he's opening the door?

A. As he's opening the door they were **squatted by the door**.[6] And that's when they seen him opening the door they seen me, they ran in. They bust right through the door and came in.

Q. And did they go directly to your location?

A. Pretty much. They did grab Mr. Bell, but they ran straight to me.

Q. And are you taken into custody at that point?

A. Yes.

Q. Handcuffed?

A. Yes.

*Id.* at 17 (emphasis added). On cross-examination, Appellant acknowledged that he could see the police and they could see him when they took Mr. Bell out. *Id.* at 18.

Following the hearing, the trial court denied Appellant's omnibus pretrial motion on October 27, 2017. On December 4, 2017, Appellant waived his right to a jury trial and proceeded to a stipulated bench trial.[7] The trial court found Appellant guilty to PWID, conspiracy, possession of a controlled substance, and possession of drug paraphernalia. On March 27, 2018, the trial court sentenced Appellant to an aggregate sentence of 30 to 60 months'

---

[6] Appellant clarified that he saw the police prior to their entry into Room 229 when they were squatted by the door as Mr. Bell was opening it. N.T. Suppression, 7/24/17, at 18.

[7] Appellant specifically requested and, the trial court agreed, that he be permitted to retain his appellate rights on the suppression issue. N.T. Trial, 12/4/17, at 3.

imprisonment, followed by two years of state probation.[8] Appellant did not file any post-sentence motion. Appellant, however, timely appealed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied. On June 22, 2018, this Court dismissed Appellant's appeal for failure to comply with Pa.R.A.P. 3517, relating to docketing statement.

On December 31, 2018, Appellant *pro se* filed a petition under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46. The PCRA court appointed counsel, who, on March 25, 2019, filed an amended petition, raising a claim for ineffective assistance of trial counsel. In specific, Appellant argued that but for counsel's failure to file a docketing statement, his direct appeal would not have been dismissed. As a result, Appellant sought *nunc pro tunc* reinstatement of his direct appeal rights. The PCRA court granted relief on January 17, 2020.

On February 10, 2020, Appellant filed a notice of appeal *nunc pro tunc.* The trial court directed Appellant to file a Rule 1925(b) statement. Appellant raised four assertions of error, challenging the denial of his omnibus pretrial motion. On November 20, 2020, the trial court issued a Pa.R.A.P. 1925(a) opinion, concluding that Appellant is not entitled to relief.

On appeal, Appellant presents two issues for our review.

---

[8] The trial court did not impose a sentence for conspiracy, possession of heroin or possession of drug paraphernalia.

[I.] Whether the trial court erred in denying Appellant's motion to suppress evidence seized pursuant to a search warrant on the basis that law enforcement violated the knock [and announce rule] as required by Pennsylvania Rules of Criminal Procedure 207 and Article 1, § 8 of the Pennsylvania Constitution?

[II.] Whether the trial court's denial of Appellant's motion to suppress evidence on the basis that the intercept was not supported by reasonable grounds to suspect criminal activity was supported by the record and free from legal error?

Appellant's Brief at 2 (unnecessary capitalizations omitted).

In reviewing appeals from an order denying suppression, our standard of review is limited to determining

whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Griffin**, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. **In re interests of L.J.**, 79 A.3d 1073, 1088-89 (Pa. 2013).

Appellant first argues that the trial court erred in denying his suppression motion because the evidence adduced at the suppression hearing established that the police failed to comply with the knock and announce rule when they entered Room 229 before, or simultaneous to, announcing their identity and failed to announce their authority or purpose. Appellant's Brief at 6-7. Additionally, Appellant claims that the Commonwealth failed to satisfy

any of the four exigent circumstances to justify the officers' noncompliance with the knock and announce rule.  *Id.* at 7.

The Commonwealth seemingly concedes that the police officers failed to comply with the knock and announce rule,[9] but invokes an exception to justify the officers' noncompliance.  Commonwealth's Brief at 10.  Particularly, the Commonwealth claims that the officers "*were* virtually certain that the occupants of the motel room already knew their purpose when the officers entered the room without knocking and announcing their purpose."  *Id.* (emphasis in original).

We explained the knock and announce rule in ***Commonwealth v. Frederick***, 124 A.3d 748 (Pa. Super. 2015), ***appeal denied***, 138 A.3d 2 (Pa. 2016):

> Pennsylvania Rule of Criminal Procedure 207 codifies the "knock and announce" rule:
>
>> (A) A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, unless exigent circumstances require the officer's immediate forcible entry.[10]
>>
>> (B) Such officer shall await a response for a reasonable period of time after this announcement of

---

[9] Given the Commonwealth's concession, we decline to address separately Appellant's argument that the police officers' failed to comply with Rule 207 (knock and announce rule).

[10] Forcible entry is "any unannounced entry, regardless of the actual force used."  ***Commonwealth v. Duncan***, 390 A.2d 820, 824 (Pa. Super. 1978) (citing ***Sabbath v. United States***, 391 U.S. 585 (1968)).

identity, authority, and purpose, unless exigent circumstances require the officer's immediate forcible entry.

(C) If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as is necessary to execute the search.

Pa.R.Crim.P. 207.[11] "Although this rule is frequently referred to as 'knock and announce,' the rule actually imposes no specific obligation to knock." *Commonwealth v. Walker*, 874 A.2d 667, 671 (Pa. Super. 2005) (quoting *Commonwealth v. Doyen*, 848 A.2d 1007, 1012 (Pa. Super. 2004)). Nonetheless, the rule requires that police officers announce their identity, purpose and authority and then wait a reasonable amount of time for the occupants to respond prior to entering any private premises.[12] *Commonwealth v. Crompton*, 682 A.2d 286, 288 (Pa. 1996). This requirement, however, will be relaxed only in the presence of exigent circumstances. *Carlton*, 701 A.2d at 148. Our Supreme Court has recognized only four exigent circumstances:

---

[11] Rule 207 came about in 2000 as a result of the renumbering of Rule 2007, its predecessor. Rule 207 was amended, effective April 1, 2001. The amendments to Rule 207 were minor and did not substantially change the import of the rule.

[12] Discussing the genesis of the rule, our Supreme Court explained:

The "knock and announce" rule's origins pre-date the United States Constitution. It was born in English Common Law and was subsequently adopted in America. In recent times, the "knock and announce" rule has assumed a Constitutional dimension. Both our Supreme Court and United States Supreme Court have held that the Fourth Amendment's prohibition against unreasonable searches and seizures applies to the manner of a warrant's execution. Even a valid warrant may not be executed in an unreasonable manner; unreasonableness is determined on a case-by-case basis.

*Commonwealth v. Carlton*, 701 A.2d 143, 147 (Pa. 1997) (citations and some quotations marks omitted).

> 1. the occupants remain silent after repeated knocking and announcing;
>
> 2. ***the police are virtually certain that the occupants of the premises already know their purpose***;
>
> 3. the police have reason to believe that an announcement prior to entry would imperil their safety; [or[13]]
>
> 4. the police have reason to believe that evidence is about to be destroyed.

***Commonwealth v. Chambers***, 598 A.2d 539, 541 (Pa. 1991); ***accord Commonwealth v. Means***, 614 A.2d 220, 222 (Pa. 1992); ***Crompton***, 682 A.2d at 288; ***Carlton***, 701 A.2d at 147. [ . . .]. [To invoke an exception, police ***must possess only "a reasonable suspicion that one of these grounds is present***." ***Commonwealth v. Kane***, 940 A.2d 483, 489 (Pa. Super. 2007), ***appeal denied***, 951 A.2d 1161 (Pa. 2008) (emphasis added).]

"The purpose of the 'knock and announce' rule is to prevent violence and physical injury to the police and occupants, to protect an occupant's privacy expectation against the unauthorized entry of unknown persons, and to prevent property damage resulting from forced entry." ***Chambers***, 598 A.2d at 541. The purpose of the rule may be achieved only through police officers' full compliance. ***See id.*** Indeed, our Supreme Court has held that "in the absence of exigent circumstances, forcible entry without announcement of [identity, authority and] purpose violates Article I, Section 8 of the Pennsylvania Constitution, which proscribes unreasonable searches and seizures." ***Carlton***, 701 A.2d at 148 ("In a free society, the mere presence of police does not require an individual to throw open the doors to his house and cower submissively before the uniformed authority of the state."). Our

---

[13] Even though the exigencies are enumerated with the conjunctive "and," courts have held that "any one of the instances justifies noncompliance with the knock and announce rule." ***Commonwealth v. Piner***, 767 A.2d 1057, 1059 n.1 (Pa. Super. 2000) (holding that the second exigency applied because "a uniformed officer stood under a porch light and engaged the attention of at least several occupants with an announcement of his identity, authority, and purpose").

- 15 -

Supreme Court has determined that "the remedy for noncompliance with the knock and announce rule **is always suppression**." **Crompton**, 682 A.2d at 290 (emphasis added).

During a suppression hearing, the Commonwealth bears the burden of proving that the police seized evidence without violating defendant's constitutional rights. **Id.** at 288. "The Commonwealth can satisfy its burden by establishing either that the police complied with the knock and announce rule or that the circumstances **satisfied an exception**." **Id.** (emphasis added).

**Frederick**, 124 A.3d at 754 (emphasis added).

Instantly, based upon our review of the record, as detailed above, we agree with the Commonwealth. The trial court did not err in denying Appellant's suppression motion because the Commonwealth established an exception to the knock and announce rule. Under the totality of the circumstances of this case, the Commonwealth demonstrated that the officers possessed reasonable suspicion to believe that knock and announce would be futile. The *officers* were virtually certain that Appellant (and Ms. McNeal) already knew their purpose when he (or they) observed them outside of Room 229.[14] As the trial court found, the officers executed the search warrant shortly after the CI engaged in a controlled buy of heroin from Appellant, and Appellant obviously knew he was in possession of a large quantity of illegal drugs. When the officers were approaching Room 229, they encountered Mr. Bell who was exiting that room. The trial court found that the "officers were

---

[14] The Commonwealth correctly points out that the second exigency to justify the noncompliance with the knock and announce rule requires that the *police* and not Appellant be virtually certain that Appellant already knew the purpose of the police presence.

not given the chance to knock" because of Mr. Bell's opening the door and exiting the room. Trial Court Opinion, 11/30/17, at 13. Thus, as Mr. Bell was exiting the room, the door to Room 229 was sufficiently ajar for Appellant to observe the officers,[15] who were attired in tactical vests displaying the word "police", squatting outside the room. Appellant further observed the officers detain Mr. Bell, announce their presence by shouting police, and enter the room. Again, given the circumstances of this case, we cannot disagree with the trial court's conclusion that the officers were virtually certain that Appellant already knew of the officers' purpose when he observed them outside of Room 229. Appellant does not obtain relief.[16]

We now turn to Appellant's second argument that the trial court erred in denying his suppression motion because the interception was not supported by reasonable grounds to suspect criminal activity.[17] Appellant's Brief at 23. Specifically, Appellant claims that the information provided by the CI to the detectives prior to the interception "was not supported by reasonable grounds

---

[15] Similarly, the officers observed Appellant and Ms. McNeil near the bed area.

[16] In light of the disposition of this case, we need not address whether the officers entered Room 229 in good faith. We note, however, that the good faith exception to the exclusionary rule does not exist under the Pennsylvania Constitution. **Frederick**, 124 A.3d at 756.

[17] Appellant concedes that he does not question that all procedures set forth in the Wiretap Act were followed to obtain the wiretap. Appellant's Brief at 24-25.

to suspect criminal activity."[18]  *Id.* at 25.  Appellant claims that Detective Condrad did not receive an abundance of information from the CI.  In support, Appellant points out that Detective Condrad did not know whether the CI had any illicit dealings with Appellant.  *Id.* at 27.  Appellant also notes that the CI neither claimed to have purchased narcotics from Appellant prior to meeting with the detectives, nor explained how he learned that Appellant was selling drugs from the Econo Lodge.  *Id.*  Moreover, Appellant argues that the detectives did not conduct any independent investigation into Appellant prior to seeking a consensual wiretap.  *Id.*

> We previously have explained that the Wiretap Act
>
> is a pervasive scheme of legislation which suspends an individual's constitutional rights to privacy only for the limited purpose of permitting law enforcement officials, upon a showing of probable cause, to gather evidence necessary to bring about a criminal prosecution and conviction.  The statute sets forth clearly and unambiguously by whom and under what circumstances these otherwise illegal practices and their derivative fruits may be used.

*Commonwealth v. Glass*, 200 A.3d 477, 483 (Pa. Super. 2018), *appeal denied*, 216 A.3d 226 (Pa. 2019).  The Wiretap Act, however, provides an exception, which allows law enforcement to utilize wiretaps without obtaining prior judicial approval when one of the parties to the conversation provides consent.  *Id.*

---

[18] Appellant did not challenge the CI's reliability before the trial court.  Any argument now presented on this issue is waived.  *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

Section 5704, relating to exceptions to prohibition of interception and disclosure of communications, provides in relevant part:

It shall not be unlawful and no prior court approval shall be required under this chapter for:

. . . .

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:

. . . .

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be initiated, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however, such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom[.]

18 Pa.C.S.A. § 5704(2)(ii).

"In determining whether the approval of a consensual wiretap was proper, this Court has determined that police officers must articulate

'reasonable grounds' for the monitoring and the Attorney General or the district attorney must verify that that these reasonable grounds exist." ***Commonwealth v. McMillan***, 13 A.3d 521, 525 (Pa. Super. 2011), ***appeal denied***, 27 A.3d 244 (Pa. 2011); ***see also Commonwealth v. Taylor***, 622 A.2d 329, 333 (Pa. Super. 1993) (explaining that reasonable grounds existed to support a consensual wiretap when, prior to the interception, the informant provided police with abundant information about his illegal dealings with the defendant and the assistant attorney general interviewed the informant to verify the existence of the reasonable grounds).

Here, given the totality of the circumstances present in this case, we conclude that the trial court did not err in denying Appellant's suppression motion based upon his argument that the interception was unsupported by reasonable grounds. Here, the detectives articulated reasonable grounds for monitoring. The CI approached the detectives with specific information about an individual selling heroin from his motel room. Specifically, the CI informed the detectives that a heavyset black male, in his 30s and approximately 6 feet and 2 inches tall, was selling heroin from Room 229 at the Econo Lodge. Not only did the CI provide the detectives with the individual's phone number, but also shared with them his street alias, Bo. The detectives determined that Bo was Appellant's alias, with whom they were familiar from prior investigations. The detectives then printed out a picture of Appellant from JNET and the CI positively identified him as Bo. Thus, based on these facts, and the officers' prior knowledge of Appellant, they possessed reasonable grounds for

monitoring.[19]  Moreover, Deputy District Attorney Ossont confirmed these facts and consensualized the CI prior to intercepting and recording the CI's communication with Appellant.  Under these circumstances, Appellant is not entitled to relief.

For the foregoing reasons, we cannot conclude that the trial court erred in denying Appellant's omnibus pretrial suppression motion.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/14/2021

_____

[19] To the extent Appellant appears to challenge the suppression court's weight and credibility determinations, we reject such challenge.  As an appellate court, we cannot upset the credibility determinations of the suppression court, "within whose sole province it is to pass on the credibility of witnesses and the weight to be given their testimony."  *Commonwealth v. Poplawski*, 130 A.3d 697, 711 (Pa. 2015).